H. B. ZACHRY COMPANY, Appellant,

v.

The TRAVELERS INDEMNITY COMPANY et al., Appellees.

MILES AND SONS, INC., et al., Appellants,

v.

H. B. ZACHRY COMPANY et al., Appellees.

No. 24576.

United States Court of Appeals
Fifth Circuit.

Feb. 19, 1968.

Rehearing Denied May 2, 1968.

**44**

Chester H. Johnson, San Antonio, Tex., Stanley P. Wilson, Abilene, Tex., for appellants.

Gordon Johnson, San Francisco, Cal., Josh H. Groce, San Antonio, Tex., for appellees.

Before TUTTLE, GEWIN and GOD-BOLD, Circuit Judges.

GODBOLD, Circuit Judge:

H. B. Zachry Company was the prime contractor on construction for the United States government of Twin Buttes Dam, near San Angelo, Texas. The major work of the project was a mammoth earth-fill embankment eight miles long with a maximum height of 130 feet. To prevent erosion from wave action of impounded waters a layer of rock fragments known as "riprap" was to be furnished and placed on the upstream slope of the dam. Zachry subcontracted the riprap work to Miles-Sierra, a joint venture. Travelers Indemnity Company was surety on Miles-Sierra's performance bond.

Zachry sued Miles-Sierra and Travelers, claiming breach of the sub-contract. Miles-Sierra filed a cross-claim and third-party complaint against Zachry and its surety claiming, among other things, that Zachry failed to furnish an adequate supply of rock, meeting the specifications, to be processed into riprap by Miles-Sierra. By agreement issues of damages were severed, and only issues of liability have been determined. The district court, sitting without a jury, found that Miles-Sierra breached the contract but that Zachry was barred from recovery because without any written change order from the *government contracting officer* Miles-Sierra had been "called upon" to proceed to complete its work using marginal riprap material, some of which did not comply with the prime contract specific gravity requirement set out in the specifications. The court found Miles-Sierra not entitled to recover on its cross-claim and third party complaint because of its own breaches and for failure to prove its claim that the supply of rock furnished by Zachry for riprap was inadequate.

Zachry and Miles-Sierra appealed; however, Miles-Sierra does not pursue its appeal from the denial to it of affirmative relief. We reverse the denial of recovery to Zachry and remand for assessment of its damages.

1. "SUBCONTRACT: SUBCONTRACTOR *agrees to furnish all materials, equipment and labor and perform all work described herein, all in accordance with the terms, conditions and specifications of the* GENERAL CONTRACT, *such work being more specifically described as follows:*

"*Process, load, haul and place Riprap, approximately 750,000 C.Y., in strict accordance with contract plans and specifications, particularly Para. 67—Riprap.*

"*Subcontractor is to secure stone from Contractor's leases at Sites 1 or 2 and is to comply fully with all requirements of leases between Contractor and property owner covering said locations where riprap stone is secured.*"

\*   \*   \*   \*   \*

"*Contractor guarantees that material in either Sites 1 or 2 will meet specifications and in sufficient quantity to complete required yardage in the pit selected by Subcontractor.*"

\*   \*   \*   \*   \*

"*Should the* SUBCONTRACTOR, *at any time, fail in the performance of the terms, stipulations and agreements contained in this Agreement, or fail to use due diligence in the performance of the work hereunder, so as to interfere with or in anywise impede allied operations of the* CONTRACTOR *and other subcontractors, if any, then, in such event, at the option of the* CONTRACTOR, *if such failure be continued five (5) days after notice in writing to the* SUBCONTRACTOR *or anyone representing it in the work, such notice stating the nature of the violation of the contract,* CONTRACTOR *may proceed thereupon to complete the work under the terms of said contract at the cost and expense of* SUBCONTRACTOR, *or, at the option of the* CONTRACTOR, *the work may be resublet at the cost and expense of the* SUBCONTRACTOR."

2. "Miles-Sierra was never in position to carry out the subcontract and breached it for failure to do its work diligently and properly. It did not have the personnel or equipment to do a job of this type and magnitude. \* \* \* Miles-Sierra realized long before July, 1961 that it could not do the job, and was glad to be relieved from *the obligations of the subcontract.* It hung on only for the purpose of mak-

Pertinent parts of the written subcontract are set out in the margin.[1] The findings of the trial court, which are amply supported by the evidence, picture Miles-Sierra's performance on the job as a total, abysmal failure.[2]

ing Zachry run it off, hoping that it would thereby be relieved from any liability for damages."

\*   \*   \*   \*   \*

"[T]here were 10,000 cubic yards of riprap bedding in place, covering an area of 3300 feet on the dam, by the end of December, 1960 in anticipation of the commencement of the placement of riprap. Miles-Sierra did not even start hauling riprap material to the damsite until the latter part of February, 1961, and it was April 25, 1961, before it began placing riprap material on the dam embankment. When Zachry took over the riprap work in July, 1961, more than a year after the execution of the subcontract, Miles-Sierra had completed the placement of only 4000 cubic yards of riprap in a manner acceptable to the contracting officer out of the approximate total of 750,000 cubic yards required to complete the job.

"During the entire period from December, 1960 to July, 1961, Zachry was constantly insisting that Miles-Sierra get along with the riprap work. Early in 1961, the Bureau of Reclamation began complaining about the lack of progress of the riprapping. Demand letters were written by Zachry and conferences were held by top executives of Zachry with executives of Miles-Sierra about the problem. At a meeting on March 27, 1961, Zachry called Miles-Sierra's attention to the fact that the delay in the riprap work had reached the point where the earthfill and allied operations would be seriously affected, and that Miles-Sierra would have to place 60,000 cubic yards of riprap per month for the balance of 1961 to keep up.

"The situation grew worse when Miles-Sierra actually began the placement of riprap. By the end of May, 1961, it had about 35,000 cubic yards in place, but the Bureau was constantly complaining to Zachry that the riprap work was slow and unsatisfactory. It was unacceptable because of excessive amounts of fines in the riprap material being used and of the large concentrations of small rocks and fines in the riprap blanket resulting from improper methods of rock placement. The Bureau Field Engineer offered various suggestions to Miles-Sierra about how their deficiencies could be

The unsatisfactory nature of the work which Miles-Sierra completed was in the placement of the riprap, use of too much fine material, and failure to place suitable mixtures of smaller and larger rocks that would accomplish the purpose of preventing erosion.[3] At no time was any of Miles-Sierra's work rejected for failure of the riprap material to meet specific gravity requirements.

In a meeting in late March, 1961 Zachry threatened to take over the riprap work and complete it under the terms of the subcontract unless Miles-Sierra's performance improved, and prior to June 21 Zachry told the Bureau it was considering doing so. In another meeting on June 30 Zachry gave oral notice to Miles-Sierra that it proposed to take over. At that time Miles-Sierra declined to waive the five-day notice required of Zachry. See note 1, supra. Zachry gave written notice to Miles-Sierra to improve its operations within five days to the rate and quality provided by the contract. Miles-Sierra protested but moved off the job and Zachry began completing the riprap work.

The basis on which the court excused Miles-Sierra from liability for its breaches arose from the requirement of the specifications that riprap must have a specific gravity of not less than 2.45. In May and June, 1961 supervising representatives of the Bureau of Reclamation of the Department of the Interior became concerned about the specific gravity of rock being used on the proj-

corrected. In May, Zachry also assigned a man on a full time basis as a laison to assist Miles-Sierra. In spite of all that help, Miles-Sierra never got to the point where it could do the work satisfactorily to the Bureau.

"Smith [the Miles-Sierra foreman, found by the court to be the only person with the company having the know-how to supervise the job] quit the job around the middle of May, 1961. The circumstances show that the only reasonable conclusion as to why he did so was that Miles-Sierra failed to furnish him the equipment and personnel to do the job satisfactorily, and he decided that he did not want the responsibility for the failure that appeared inevitable. He left and Stout placed his twenty-five year old son in charge. The boy was inexperienced and incompetent to do the work, but served the purpose of furnishing a token willingness on the part of Miles-Sierra to carry out its contract until Zachry was forced to take over.

"On June 5, 1961, the Bureau wrote a letter to Zachry advising that there would be no further progress payments for the riprap work until the subcontractor's work complied with the specifications. When Miles-Sierra received a copy of the letter from Zachry asking for a definite answer as to planned corrected procedures, it answered by apologizing to Zachry for the inefficiency of its operation and set forth certain corrective actions it intended to take."

\* \* \* \* \*

"[T]he Court finds and concludes that Miles-Sierra was at all times unable to perform its obligations under the sub-

contract solely because of its inadequacy of proper equipment in the quarry and at the damsite, its improper methods of work at each place, and to inadequate competent personnel. Miles-Sierra failed to use diligence to commence its work within the time contemplated by the subcontract, and to maintain its schedule and rate of production to meet Zachry's requirements, which the Court finds were reasonable. The extreme slowness of its work and the constant unacceptability of its [sic] seriously impeded Zachry's allied operations at the damsite; and if Zachry had permitted Miles-Sierra to continue under the subcontract, it is reasonably probable that the project would have run over the time limit and well into the $1200.00 a day delay penalty period."

\* \* \* \* \*

In approximately two months of actually putting rock on the dam (after several months of delay in starting) Miles-Sierra put down approximately 49,000 cubic yards. Of this only 4,000 yards was satisfactory. After Zachry took over the rock work it had to replace or rework approximately 45,000 yards. In four months which included time to buy equipment and train personnel, Zachry put down approximately 202,000 yards and reworked most of what Miles-Sierra had done. It completed the work satisfactorily, and the entire project was completed and accepted within the work days allowed by the prime contract.

3. If smaller rocks were concentrated in an area they would wash away. If larger rocks were concentrated the earth in spaces between them would wash away.

ect. Various tests were made and intra-Bureau consideration given to the matter. There was discussion within the Bureau, not then made known to the parties, that the required minimum of 2.45 was too high considering the large average size of the blocks into which the rock was breaking when quarried, and that considering the prevailing lithology of the limestone beds in the area relaxation of the required minimum to 2.40 seemed inevitable. On June 16 the Bureau wrote Zachry, confining placement of riprap to designated areas not the subject of heaviest potential wave action. On June 23 the Bureau sent its project engineer the following teletype:

> Re conversation with F. J. Davis in your office 6–22–61. Tan to buff limestone in upper portion of quarry, rock Site No. 1, although marginal as to specific gravity, will be acceptable if properly quarried to produce proper sizes and gradation and if quality of rock continues comparable to that at present face of quarry. Chalky portions of materials should be avoided.

The engineer considered whether there should be a change order or a letter embracing the contents of the teletype, and drafted a proposed letter which was sent to his superiors for approval but not shown to be approved and never sent to Zachry. Zachry was orally notified of the teletype at once. Although Miles-Sierra denied it was orally notified the court found that it was, a finding more than adequately supported by the evidence. Neither prime nor sub was given a written change order. On June 30 the Bureau sent Zachry a letter saying:

> The restriction in my letter of June 16, 1961, confining your riprap placing operations to areas below elevation 1900 and above elevation 1950, is hereby removed. Lifting of this restriction does not alter or change the provisions of Paragraphs 55 and 67[4] of

the specifications for materials and placement for riprap.

The trial court found that Miles-Sierra was "called upon" to proceed with marginal material that might have a specific gravity as low as 2.40 instead of greater than 2.45 as provided by the specifications, without issuance of a written change order authorizing the relaxation as required by the prime contract, imposing on Miles-Sierra the risk that use of marginal material might bring about rejection of the work before final acceptance. With obvious reluctance, "for this reason, and this alone," the court held Zachry could not recover.

■ We turn first to consideration of whether the government made it impossible for Miles-Sierra to perform its contract with Zachry. It is quite clear it did not. Had the Bureau, while leaving 2.45 in effect as the requisite minimum by reason of there being no written change order lowering it, made it impossible for Miles-Sierra to supply rock meeting that standard, supervening impossibility might have arisen. But this did not occur. Before and after June 23 Miles-Sierra was taking rock from only a 15-acre quarry and the adjacent edge of a larger site, although there was substantial larger acreage available to it. The trial judge found that approximately 50% of the core samples from the material sites made available by Zachry met specific gravity requirements and concluded that Miles-Sierra failed to prove its claim that there was an inadequate supply of specification materials; those findings are not plainly erroneous. Miles-Sierra never moved its equipment to the other locations available to it and never opened or developed them in any manner. Before and after June 23 Miles-Sierra was obligated to quarry and place rock which met the specifications and from sources found by the district court to contain materials meeting the specifications and in quantities not proved to be insufficient. At no

---

4. Paragraph 55 had to do with the quality of riprap, paragraph 67 with the manner of placing it.

time did the dealings concerning the tan and buff limestone in the 15-acre quarry prevent Miles-Sierra from furnishing riprap processed from stone that met the 2.45 standard. Impossibility may be something less than absolute, shading into impracticability because of extreme and unusual difficulty, expense, injury or loss, 6 Corbin, Contracts § 1325 (1962); Restatement of Contracts § 454 (1932), but the trial court rejected the contentions of Miles-Sierra that it was confined to the 15-acre quarry and that its expenses would have been increased had it expanded its quarrying operations into other areas.

After it received notice of the June 23 teletype, and until Zachry took over the work, Miles-Sierra continued to produce, haul and place riprap processed from the rock of the same small quarry and either wholly or partially from the tan to buff limestone strata thereof. None of that work was rejected for failure of the rock to meet specific gravity requirements.[5]

■ There was an implied condition in the sub-contract that Zachry would not require Miles-Sierra to supply riprap which did not meet specifications, see Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W. 2d 1039, 60 A.L.R. 890 (1928); Lilac Variety Inc. v. Dallas Texas Co., 383 S.W.2d 193 (Tex.Civ.App.1964), and breach by Zachry would have been a prevention of performance, see El Paso & S. W. Ry. v. Eichel & Weikel, 130 S.W. 922, 940 (Tex.Civ.App.1910). For the same reasons indicated above as to the government, but with increased force, it is clear that Zachry did not require Miles-Sierra to use marginal materials or prevent it from using the available rock meeting the 2.45 specific gravity standard.[6] Zachry did not breach an implied condition.

■■ But even if Zachry had committed such a breach Miles-Sierra was not excused from liability for its nonperformance. When the promisor on a contract not already fully performed on either side continues his performance in spite of a known excuse for nonperformance, he loses his defense of nonperformance. See Greenwall Theatrical Circuit Co. v. Markowitz, 97 Tex. 479, 79 S.W. 1069, 65 L.R.A. 302 (1904); Humphrey v. Showalter, 283 S.W.2d 91 (Tex. Civ.App.1955); 5 Williston, Contracts § 688 (3d ed. 1961); Restatement of Contracts § 309 (1932). "[Miles-Sierra was] entitled to choose between the prize of further employment with the pecuniary and other advantages that may flow from it, and the prize of freedom from [its] own liabilities under the contract." 5 Williston, supra at 302. It chose one prize at the time, continuing to perform until stopped by Zachry's takeover. Afterwards it sought to choose the other prize.

Miles-Sierra was not excused from nonperformance and there was no impossibility of performance. Zachry is entitled to recover.

Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.

5. Zachry completed the job with materials from the same sources which the court found to be available to Miles-Sierra, using much of the same tan to buff limestone. None of that material was rejected for too low specific gravity.

6. Miles-Sierra claims that Zachry, by its actions taken pursuant to the June 23 teletype, required it to use sub-specification materials. But its principals testified that no one—neither government nor Zachry—told them about the teletype until June 30 when they were notified by Zachry it was taking over the job (for reasons unrelated to the quality of the rock). The court rejected the Miles-Sierra testimony and found that company had been promptly notified of the teletype. Nevertheless Miles-Sierra is in the anomalous position of a promisor asserting that a condition of the contract was breached by the content of communications to it which it claims were never received by it.