UNITED STATES of America, For Use of
A. C. GARRETT, d/b/a Garrett Con-
struction Company, Plaintiff-Appellee
Cross-Appellant,

v.

MIDWEST CONSTRUCTION COMPANY
and Reliance Insurance Company, De-
fendants-Appellants Cross-Appellees.

No. 77–2710.

United States Court of Appeals,
Fifth Circuit.

June 16, 1980.

Rehearing Denied Aug. 4, 1980.

Benjamin Raye Collier, Dallas, Tex., for
defendants-appellants cross-appellees.

James R. Harris, Corpus Christi, Tex., for plaintiff-appellee cross-appellant.

Before GODBOLD, HILL and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Beneath the placid surface of this modest contract dispute lurk shoals, reefs and sunken choice of law questions. Boarding the good dredge *Melvin*, we steer a serpentine course to safer waters.

This suit involves a government prime contractor, Midwest Construction Company, a Nebraska citizen, and its subcontractor, Garrett Construction Company, a Texas citizen. Garrett filed suit in district court against Midwest and its surety under the Miller Act, 40 U.S.C. § 270b. It then sued Midwest alone in state court.[1] Invoking diversity jurisdiction Midwest removed the state court action, 28 U.S.C. § 1441. The district court awarded plaintiff $3,947.40 plus interest, as explained below, and attorney's fees of $3,000. We affirm in part and remand.

In November, 1972, Midwest contracted with the United States of America to: (1) dredge a new entrance channel to Port Aransas Harbor, (2) do some maintenance dredging, and (3) construct the East Breakwater of the entrance channel. Pursuant to Miller Act requirements, Midwest tendered a labor and material payment bond for $198,783.50.

There are two steps in the construction of a breakwater. A sand fill must first be deposited for a foundation; then blanket and cover stone must be placed on top of the sand to stabilize the breakwater, which would otherwise eventually wash away.

In December, 1972, Garrett subcontracted with Midwest to do the dredging and the fill work for the breakwater, for $.45 a cubic yard. As is customary in construction contracts, Midwest was entitled to retain a percentage of the payment until completion of the prime contract. Midwest did not subcontract the blanket and cover work. Anticipating that it might be necessary to dredge a flotation channel north of and parallel to the breakwater for passage of its barges carrying blanket and cover stone, Midwest provided in the subcontract that it could elect to have Garrett dredge a flotation channel at $.45 per cubic yard.

The contract and subcontract specifications called for dredged sand from the northeast half of the new entrance channel to be deposited as fill foundation in the area designated for the new East Breakwater. This deposit was to be at a 1 on 5 slope, *i. e.,* one foot vertical for five feet horizontal, until it reached the height of one foot below mean low tide. On the contract drawings and specifications there were dotted lines around the area designated for the East Breakwater, which represented limits to the spread of sand from the breakwater. Any sand from the fill which drifted and caused shoaling in the Corpus Christi Ship Channel, 400 yards to the north of the breakwater, was to be removed. The following is a rough plat of the work area.

CORPUS CHRISTI SHIP CHANNEL

NEW ENTRANCE CHANNEL

FLOTATION CHANNEL

LIMITS

WEST BREAKWATER

EAST BREAKWATER

LIMITS

PORT ARANSAS ANCHORAGE BASIN    N
( Not To Scale )

A preconstruction conference was held on January 5, 1973. To determine what transpired there the magistrate relied on the testimony of William A. Sky-Eagle, Jr., the engineer in charge of the Corpus Christi Office of the U.S. Army Corps of Engineers and the person in charge of supervising this contract. Sky-Eagle testified that all ma-

---

1. After Garrett filed suit in federal court, the decision in *F. D. Rich Co. Inc., v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), denying attorney's fees in Miller Act cases, was rendered. Garrett then filed the state court action.

jor aspects of the contract were discussed. The contracting parties considered whether some of the sand to be deposited on the East Breakwater foundation might flow into the Corpus Christi Ship Channel. It was understood that if the flow caused shoaling the contractor would have to remove the sand. The contracting officer would supervise the placing of the fill on the breakwater foundation. The area of the fill going across the old entrance channel would be a "plug" in that channel and the Corps "didn't want anything less [i. e., steeper] than a 1 on 5 slope in order to give that fill as much stability as possible." A 1 on 10, 1 on 15, or even flatter slope would be better for the project. It would be easier to control the fill by depositing it at a 1 on 5 slope, but the sand deposited on the East Breakwater would probably come to rest with a flatter side slope, between 1 on 10 and 1 on 20, because of the character of the sandy material in the area. The limits to drift represented by the dotted lines around the breakwater were minimums, not maximums: in other words, the Corps of Engineers wanted the sand to spread at least as far as the limits.

Discussions during the conference made it clear that Midwest would be unable to begin its blanket and cover work until May or June, instead of early in the year as had been originally planned. Sky-Eagle told Midwest to have Garrett put extra fill on the breakwater because during this delay there would be erosion of the sand fill by wave action and ship swells. The extra fill would allow the breakwater to erode down to the specified height by the time Midwest was ready to begin the blanket and cover work.

Garrett started work in January, 1973. Its dredge, the *Melvin*, dredged and dumped 24 hours a day. It was supervised by a representative of the Corps of Engineers, there to make sure the work was done consistent with the government's contract with Midwest.

As the matter developed, the sand did not settle at a 1 on 5 slope, but at a flatter slope, between 1 on 10 and 1 on 20. The sand spread beyond the limits around the East Breakwater and some got into the ship channel, causing shoaling. One of the issues on appeal concerns the responsibility for removal of the sand from the ship channel.

Some sand got into the area that Midwest planned to use for its flotation channel. Another issue on appeal concerns the responsibility for dredging this channel. There is a dispute over its initial depth. Midwest claimed depths ranging from 5.1 to 7.3 feet. At best, this would have allowed only marginal clearance for its tugboats, which drew from 6 to 6.5 feet of water. The Army Corps of Engineers figures, which the magistrate found were more accurate, showed depths ranging from 3 to 5 feet. Thus, even before the sand drifted the channel was too shallow to float Midwest's barges. Midwest had Garrett dredge sand from the flotation channel and deposit it on top of the breakwater fill, providing the extra fill that Sky-Eagle had asked for at the preconstruction conference.

Garrett billed Midwest $3,947.40 for the dredging of the flotation channel and the removal of the sand from the ship channel. Midwest refused to pay, claiming that the extra dredging was needed because Garrett did not deposit the sand on the breakwater at a 1 on 5 slope, as required by the specifications. Midwest insisted that it merely had Garrett remove the sand from the flotation channel and the Corpus Christi ship channel where it had spread because of Garrett's improper performance of the contract, and put it back on top of the East Breakwater where it belonged.

In August, 1973, after the entire project was completed, Midwest sent Garrett a check for $4,939.20, which represented the amount of the retainage. There was no payment for the dredging in the ship and flotation channels. This check was offered as final payment for all work on the contract. Garrett refused to accept it.

In adopting the recommendation of the magistrate the district court found that "1 on 5 slope" meant the steepest slope permissible, and that the dotted lines around the

breakwater were minimum limits. It found that the drift was foreseeable under the contract, and in any event it was partially due to Midwest's delay in doing the blanket and cover work. It found Midwest liable for the extra dredging and awarded Garrett $3,947.20 for the extra work done. It also awarded $3,000 in attorney's fees and interest on $3,552.66 ($3,947.20 less 10% properly retained until August 31, 1973, the day following the completion of all the work on the prime contract) from March 15, 1973, the date it became due, until it was paid. It awarded Garrett interest on the $394.74 properly retained for the extra work from August 31, 1973, the date the retainage became due, until it was paid. Finally, it awarded Garrett interest on the retainage sum of $4,939.20 from August 31, 1973, when it became due, until January 14, 1977, when Midwest filed a motion to deposit the $4,939.20 in court.[2]

On appeal, Midwest asserts that it is not liable for the $3,947.20 of extra work, and that it is not liable for attorney's fees. On its cross-appeal, Garrett asserts that it is entitled to interest on the $4,939.20 from January 14, 1977, until June 13, 1977, the date of Judgment.

The magistrate did not indicate what law was applied in resolving the merits of the contract dispute or in the award of attorney's fees.

### The Contract—Parol Evidence

█ Midwest contends that the magistrate should not have admitted extrinsic evidence to prove the meaning of "1 on 5 slope" and the dotted lines around the breakwater. Midwest argues that the parol evidence rule bars Sky-Eagle's testimony. Therefore, it contends that its construction of the term "1 on 5 slope" as meaning no flatter than 1 on 5, and its interpretation of the dotted lines as indicating the maximum drift of sand, not the minimum, should be accepted. We disagree. Under federal common law, as under the law of most states, including Texas, parol evidence is admissible to prove the meaning of ambiguities in contract language. *Chadwick v. Esperanza Trade & Transport, LTD.*, 548 F.2d 1161, 1162 (5th Cir. 1977) ("If the language of the contract is ambiguous, extrinsic evidence may be received to determine its meaning."). The core question is the intent of the parties. *Local 509, Int'l. Ladies Garment Workers Union*, 1967 Lab. Cas. ¶ 12,033 (D.Kan. 1967); *United States v. Sea Gate, Inc.*, 397 F.Supp. 1351 (D.N.C. 1975). Further Garrett contends, with obvious merit, that the parol evidence rule would not proscribe evidence offered to explain the meaning of special or technical terms. *See Brenneman v. Bush*, 30 S.W. 699 (Tex.Civ.App.—1895); *General Bonding & Casualty Ins. Co. v. McQuerry*, 191 S.W. 858 (Tex.Civ.App.—1917).

### Attorney's Fees—Miller Act Case

█ The next issue is the award of attorney's fees. Under *F. D. Rich Co. Inc. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), federal common law governs the claim for attorney's fees in Miller Act cases. Absent a contractual basis or controlling statutory provision, attorney's fees are only allowed where the opposing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," 417 U.S. at 129, 94 S.Ct. at 2165. The Supreme Court recognized this as the American common-law rule governing the allowance of attorney's fees. There was no showing that Midwest acted in bad faith, vexatiously, wantonly or for oppressive reasons. The award of attorney's fees, to the extent it is based on the Miller Act claim, must be reversed. *See United States ex. rel. Carter Equipment Co., Inc. v. H. R. Morgan, Inc.*, 554 F.2d 164 (5th Cir. 1977).

### Attorney's Fees—Diversity Case

█ The issue is different, however, when one examines the question of attorney's fees in the diversity case removed and consolidated with the Miller Act case. *F. D. Rich* proscribes attorney's fees in Miller

---

2. The motion was not granted by the district court until October 25, 1977, long after the date of judgment.

Act cases absent a controlling contractual or statutory provision. However, *F. D. Rich* is not authority for the denial of attorney's fees allowed by state law, when the matter is before the court pursuant to diversity jurisdiction.

In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court noted that the rule applied in *F. D. Rich* was inapposite in diversity cases:

> A very different situation is presented when a federal court sits in a diversity case. "[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." 6 J. Moore, Federal Practice ¶ 54.77 [2], pp. 1712–1713 (2d ed. 1974) (footnotes omitted). See also 2 S. Speiser, Attorneys' Fees §§ 14:3, 14:4 (1973) (hereinafter Speiser); Annotation, *Prevailing Party's Right to Recover Counsel Fees in Federal Courts*, 8 L.Ed.2d 894, 900–901. Prior to the decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938), this Court held that a state statute requiring an award of attorneys' fees should be applied in a case removed from the state courts to the federal courts: "[I]t is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts." *People of Sioux County v. National Surety Co.*, 276 U.S. 238, 243 [48 S.Ct. 239, 241, 72 L.Ed. 547] (1928). The limitations on the awards of

attorneys' fees by federal courts deriving from the 1853 Act were found not to bar the award. *Id.*, at 243–244 [48 S.Ct. at 240–241]. We see nothing after *Erie* requiring a departure from this result. See *Hanna v. Plumer*, 380 U.S. 460, 467–468 [85 S.Ct. 1136, 1141–1142, 14 L.Ed.2d 8] (1965).

421 U.S. at 259 n. 31, 95 S.Ct. at 1623 n. 31.

The *Alyeska* explanation that *F. D. Rich* merely "reaffirmed the general rule" against fee awards (421 U.S. at 257, 95 S.Ct. at 1621), leads to our conclusion that this passage controls and justifies the award of attorney's fees to Garrett. Attorney's fees are recoverable under Texas law for breach of contract as presented herein. *Roylex, Inc. v. Avco Community Developers, Inc.*, 559 S.W.2d 833 (Tex.Civ.App.—1977).

### The Deposit—Interest

The final question relates to the proper computation of interest. Garrett asks for interest on the retained sum of $4,939.20 from January 14, 1977 to June 13, 1977. The district court awarded interest from August 1, 1973 to January 14, 1977. On January 14, 1977, Midwest filed a motion to deposit $4,939.20 in the registry of the court in accordance with Rule 67, Fed.R.Civ.P. The case was tried and judgment was entered for Garrett on June 13, 1977. Interest on the retainage was allowed only to the date of the filing of the motion to deposit. The motion to deposit was not granted until October, 1977.

The issue is whether the mere filing of a motion to deposit stops the accrual of interest. We think not. Rule 67 governs the procedure for deposits.[3] Leave of court was never granted. No deposit was ever made. Had Midwest attached a money order or some other cash equivalent to its motion for deposit, thereby depriving itself of the use of the money pending disposition of its motion, there might be some equity in its position. It did not do so. During the

---

**3.** Rule 67. Deposit in Court. In an action in which any part of the relief sought is a judgment for a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing. Money paid into court under this rule shall be deposited and withdrawn in accordance with the provisions of Title 28, U.S.C. §§ 2041 and 2042; the Act of June 26, 1934, c. 756, § 23, as amended (48 Stat. 1236, 58 Stat. 845), U.S.C., Title 31, § 725v; or any like statute.

period in question, Midwest had the use of the retainage money which it unquestionably owed Garrett. In order to stop the accrual of interest Midwest had to make the money available to Garrett without attempting to impose conditions on its acceptance. We remand to the district court for computation and award of interest on the $4,939.20 from January 14, 1977 to June 13, 1977, in addition to the interest allowed in the judgment.

### Conclusion

We affirm the judgment in favor of Garrett for $3,947.40 for extra work, together with interest as set forth in the judgment, and affirm the award of attorney's fees. We remand for computation of the additional interest due on the retainage sum of $4,939.20.

For these reasons the judgment is AFFIRMED IN PART AND REMANDED IN PART.