UNITED STATES of America for Use
and Benefit of EASTERN GULF,
INC., Plaintiffs–Appellants,

v.

METZGER TOWING, INC., and The
Travelers Indemnity Company,
Defendants–Appellees.

No. 89–7243.

United States Court of Appeals,
Eleventh Circuit.

Sept. 6, 1990.

Lawrence B. Voit, Wanda J. Cochran, Silver & Voit, Mobile, Ala., for plaintiffs-appellants.

John R. Lockett, Mobile, Ala., for defendants-appellees.

Before JOHNSON, Circuit Judge, HILL[*] and HENLEY[**], Senior Circuit Judges.

HILL, Senior Circuit Judge:

This appeal involves claims for (1) breach of a towage agreement and (2) "sums justly due" under the Miller Act, 40 U.S.C. §§ 270a–270d (1986), for "labor or material" supplied in connection with a United States Army Corps of Engineers ("Corps") project to build a revetment on the Gailliard Disposal Island ("Gailliard") in Mobile Bay, Alabama.[1] Plaintiff, Eastern Gulf, Inc. ("Eastern"), an Alabama Corporation that owned and operated the tugboat SOUTHERN MISS during 1986 and 1987, brought suit against Metzger Towing, Inc. ("Metzger"), a Mississippi Corporation, for the payment of "standby" expenses Eastern claimed it incurred while towing barges pursuant to a subcontract with Metzger.[2] After a two-day bench trial, the District Court for the Southern District of Alabama entered a judgment that effectively denied Eastern's claims. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

On January 2, 1986, the Corps awarded Metzger the prime contract to construct approximately 16,500 feet of revetment[3] on Gailliard. Metzger had already reached an informal agreement with Offshore Company, Inc. ("Offshore"), that Offshore would do the actual construction if Metzger received the contract.[4]

Eastern signed a contract with Metzger on January 31, 1987, agreeing to tow barges laden with stone from a quarry in Kentucky down the Tennessee–Tombigbee Waterway to the Theodore Industrial Canal near Gailliard in Alabama, where Metzger or Offshore would unload the barges by

---

[*] See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Appellee Travelers Indemnity Company issued a Miller Act surety bond for all persons entitled to payment under the Act. See 18 U.S.C. §§ 270a, 270b.

2. Metzger filed a counterclaim that is not relevant to this appeal.

3. A revetment is a facing of stone used to shore up and protect an embankment and control erosion. The site is graded and prepared with filter cloth prior to placement of the stone.

4. Appellant makes much of the fact that Cletus Metzger, President of Metzger Towing, Inc., arranged to have Offshore and Eastern perform virtually all of the work required under the prime contract with the Corps. Appellant claims that the Corps approved Metzger's plan to have Offshore construct the revetment only after Metzger represented it would fulfill its contractual obligation to perform at least twenty percent of the work by supervising Offshore and delivering the stone for the project. As we explain in the text, Metzger in fact hired Eastern to deliver the stone. Appellant suggests that Metzger misled the Corps. Even if true, these allegations are irrelevant to the issues in this appeal. At best, they merely bring to mind the words of America's preeminent authority on "truth" as it exists on the river:

There was things which he stretched, but mainly he told the truth.

M. Twain, The Adventures of Huckleberry Finn, ch. 1 (1884) (Huckleberry describing the author).

crane and truck the stone to the nearby revetment project. In pertinent part, the agreement read as follows:

> WHEREAS, Metzger Towing (herein "Metzger") has a contract with the United States Army Corps of Engineers for the construction of a stone revetment on the Gailliard Disposal Island in Mobile, Alabama; and
>
> WHEREAS, it will be necessary to transport the stone used on the project by barge from Smithland, Kentucky to the Theodore Industrial Canal; and
>
> WHEREAS, Metzger has chartered four barges for the purpose of transporting the stone and it is Metzger's desire to hire Eastern Gulf, Inc. (herein "Eastern") to tow the barges until the Gailliard Island project is completed;
>
> NOW THEREFORE, Metzger and Eastern agree as follows:
>
> 1. Eastern agree[s] to furnish the services of the tug, SOUTHERN MISS, to tow the stone in multiple trips from Smithland, Kentucky to the Theodore Industrial Canal in Mobile, Alabama.
>
> 2. For the first trip, *Eastern will accept delivery of four light barges* number RM707, RM710, RM714, and RM716 at the dock of Ideal Basic Industries on *February 1, 1986.* Eastern shall transport the barges from Mobile to Smithland, Kentucky to be loaded and return the same to Theodore Industrial Canal.
>
> 3. For each subsequent trip[,] *Eastern shall accept delivery of four light barges* upon completion of offloading by Metzger and/or its subcontractors. *Metzger agrees to make diligent effort to unload the barges within six days or less after delivery by Eastern. Eastern will make diligent effort to make each subsequent delivery of stone to Metzger within 15 days after the completion of offloading of the prior delivery.*

> 4. (a) Metzger shall pay Eastern $4.50 for each ton of stone delivered to the Theodore Industrial Canal. It is agreed that tonnage shall be measured by the United States Army Corps of Engineers in the manner set forth in Exhibit 1 to this agreement.

(Emphasis added).

The prime contract required Metzger to complete the project by January 1988. In negotiations leading to the Eastern subcontract, Metzger made clear its intention to complete the project in late summer or fall, although the exact date of that projection is disputed. The Eastern subcontract provided that the SOUTHERN MISS would depart for its first load of stone on February 1, 1987, but did not specify a final completion date for its services and only stated that Eastern would provide towage services until the project was completed.

The parties agreed on a contract price based on the tonnage of stone delivered in the barges rather than as a charter of Eastern's tug. Paragraph Eight of the agreement, not quoted above, stated that "[t]his agreement shall likewise be construed as a contract for towage service and shall not be construed as a charter of the tug or give rise to a personal contract." [5]

It is undisputed that although the subcontract did not provide for a specific completion date, the $4.50 per ton price was arrived at by considering the number of tons needed for the project (approximately 67,800), the number of trips required to deliver the stone given the capacity of the barges, the number of days needed to make a round-trip, and the number of days it would take for Metzger or Offshore to unload the barges and make them available for a return trip to the quarry. Eastern agreed to "make diligent effort to make each subsequent delivery of stone to Metzger within 15 days after the completion of off loading of (sic) the prior delivery." Metzger in turn agreed to "make diligent

---

**5.** The parties disputed whether they had agreed that the tug would be "dedicated" to the project, i.e., not available to do other work during idle days when Metzger unloaded the stone from the barges.

effort to unload the barges within six days or less after delivery by Eastern."[6]

The contract did not define "diligent" and made absolutely no provision for what should happen if either party could not carry out its commitment within the agreed upon time period despite "diligent effort."

It is also undisputed that while Eastern made each of its deliveries within the fifteen-day period, Metzger required more than six days to unload the stone on several occasions. The district court made numerous factual findings regarding the reasons for the delays.[7] First, the jobsite was unprepared for placement of the first load of stone due to poor weather (fog) and delays in obtaining Corps approval to change the location for dredging due to an unanticipated shell reef. Although the SOUTHERN MISS returned with the first load of stone on February 15, Metzger did not unload the barges for nearly a month since the site was not prepared. Mechanical breakdowns of various equipment used to remove the stone from the barges and move it to the jobsite delayed the offloading on subsequent trips as well.

Eastern complained of the delays and Metzger agreed to rent four additional barges for one trip in April 1986, and two additional barges in June 1986 to rectify the delays. Metzger also "approved extra work which Eastern found during the delay period in order to ease the financial burden." District Court Order at 10. Be-

tween April and mid-August there were no delays in excess of six days.[8] However, as a result of malfunctioning equipment and the fact that at one point Metzger/Offshore ran short of filter cloth,[9] Metzger required more than six days to unload the stone on several occasions between mid-August and the project's completion in early November.

In November 1986, the Corps authorized Metzger to construct additional revetment footage not specified in the original prime contract. Despite the delay problems, Eastern agreed to deliver stone for the revetment extension under the same terms as the original subcontract after Metzger pointed out that the additional work would provide an opportunity to offset the earlier delays. During the time Eastern delivered stone for the extension, however, there was a fourteen-day delay in offloading due to crane repairs and three days in which Offshore employees were off, presumably for the Thanksgiving holiday.

Specifically with regard to Eastern's conduct, it is undisputed that Eastern (1) continued to perform despite the delays,[10] (2) accepted additional tow work under Metzger's extension of its contract with the Corps without demanding new terms, (3) and did not bill Metzger for any "standby time" until January 1988, after it had completed work under the original contract and the extension.[11]

---

**6.** Metzger requested Eastern to specify the price per ton at which Eastern could tow on the basis of an eight-day, rather than a six-day, time frame for unloading the stone. Eastern responded that its price would be higher; Metzger declined to contract at the price for a eight-day unloading schedule. An official for Offshore also testified that he told Metzger it would probably take an average of eight days to unload the barges.

**7.** Appellant does not contest any of the district court's findings of fact. Appellant's Brief at 9 n. 1.

**8.** Eastern was delayed in excess of six days on the following dates:

| | | | |
|---|---|---|---|
| February 14 | – | March 15 | (28.79 days) |
| March 28 | – | April 12 | (15.00 days) |
| August 20 | – | August 27 | ( 7.38 days) |
| September 12 | – | September 23 | (10.94 days) |

| | | | |
|---|---|---|---|
| October 7 | – | October 17 | (10.22 days) |
| October 31 | – | November 10 | ( 9.84 days) |
| November 23 | – | December 7 | (15.14 days) |

District Court Order at 5.

**9.** Filter cloth is a necessary prerequisite to revetment construction.

**10.** Cletus Metzger testified that he offered Eastern several opportunities to cease performing under the contract after Eastern complained of the delays. He claims Eastern declined his offer on the ground that tow work was scarce at the time. Eastern denies this.

**11.** In contrast, Eastern had billed Metzger on a monthly basis for its deliveries; it did not wait until after the contract was completed to demand payment.

## II.  DISCUSSION

### A.  *The Contract Claim.*

The district court held that Metzger and Eastern entered into a maritime contract for towage services.  *See generally,* G. Gilmore & C. Black, The Law of Admiralty § 1–10 (2d ed. 1975).  With certain exceptions not implicated in this case, the general rules of contract interpretation control when a court construes a towage agreement.  A. Parks, The Law of Tug, Tow, & Pilotage 38 (1982) (hereinafter "Parks").

The court also found that the contract unambiguously did not provide for the payment to Eastern for "standby time" in excess of six days.  Whether the contract was unambiguous in this regard is a question of law subject to plenary review by this court.  *Cathbake Inv. Co. v. Fisk Elec. Co.,* 700 F.2d 654, 656 (11th Cir.1983) (citing *Suburban Realty Co. v. United States,* 615 F.2d 171 (5th Cir.1980).  We agree with the district court that the contract was not ambiguous in this regard.

The agreement between the parties makes absolutely no mention of standby time or standby expenses.  Paragraph Eight of the contract, quoted above, explicitly stated that the contract was not to be construed as a charter of the tug or a personal contract.  Unless the towage service is elevated to a salvage service,[12] the amount recoverable under a towage agreement is limited to the terms of the contract; "no subsequent circumstances will entitle the tug to recover more than the contract price."  86 C.J.S. *Towage* § 19 (1954).  *See* Parks, *supra* at 125.  *See also* 17A C.J.S. *Contracts* § 361 (1963) (express stipulation for compensation measures amount of recovery for performance).

As the district court stated, "[e]ven if recovery of standby time is examined in the context of a separate oral agreement, ... there was no meeting of the minds of the parties on this item."  District Court Order

at 15.  The record supports this conclusion.  Eastern did not bill for standby time until after it had completely performed under the original contract and its extension;  nor did Eastern even keep a contemporaneous log of standby time.  Finally, although Eastern disputed the suggestion that when it complained of not being compensated for excess standby time, Metzger indicated that Eastern "could give up the job."  *Id.* at 16 (footnote omitted), by its own admission Eastern did not demand compensation for the excess standby time, but merely complained that Metzger should eliminate further delays.

Eastern argues that the district court erred in not looking to industry custom and the intentions of the parties to find that the contract contemplated payment for standby time in excess of six days at each offloading of the stone.  We disagree.  Under federal maritime law, a court "may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous."  *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332–33 (5th Cir. Unit A 1981) (citing *Hicks v. Ocean Drilling and Exploration Co.,* 512 F.2d 817, 825 (5th Cir.1975), *cert. denied sub nom. H.B. Buster Hughes, Inc. v. Ocean Drilling and Exploration Co.,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976).[13] Since the contract is not ambiguous with regard to whether the parties agreed that Metzger would pay Eastern for standby time in excess of six days (regardless of Metzger's diligence in attempting to offload in less time), the district court did not err.

The ambiguity in the contract and the heart of the dispute in this case stems from the lack of a precise standard for determining "diligent effort" under the contract.  Eastern argues that "[b]ecause the [district] court ruled the contract unambiguous, it did not consider any testimony

---

**12.**  Eastern does not claim that its towage service was elevated to a salvage service.  *See generally,* 78 C.J.S. *Salvage* § 123 (1952).

**13.**  In the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

about the parties intentions concerning the ["diligent effort"] provision in the contract." Appellant's Brief at 33. Eastern suggests that because both Metzger and Eastern stipulated that they would use "diligent effort" to meet their respective timing obligations under the contract, the contract was ambiguous with regard to whether Metzger agreed to compensate for excess standby time. The record contains no support for this inferential leap.

The "diligent effort" clause merely provided the standard by which the parties agreed to govern their effort in meeting their timing obligations. In other words, the district court had to determine whether Metzger breached the contract by failing to use "diligent effort" in unloading the barges within six days. If Metzger failed to use "diligent effort," then we presume without deciding that Eastern's standby time would be an element of its damages resulting from the breach.

Eastern maintains that "[t]he term 'diligence' is by definition imprecise, and can only have meaning by reading the term in context. Context in this case is the parties' conduct, their intent, and industry custom." We find no indication in the record that the district court limited the submission of evidence on the question of whether Metzger was "diligent"; nor did the court refuse to consider Eastern's evidence in this regard. On the contrary, the court made detailed factual findings regarding the reasons for the delays—findings that Eastern concedes were not clearly erroneous. Appellant's Brief at 9 n. 1.

Eastern argued at trial that "diligent effort" meant that both parties would perform their respective tasks of delivering and unloading the stone within the time frames specified in the contract, absent delays attributable to severe weather or other unforeseen circumstances. District Court Order at 15; Appellant's Brief at 14–15. The district court considered the evidence regarding the delays, found that Eastern had not proven by a preponderance of the evidence that Metzger failed to use due diligence in unloading the stone, *id.* at 17, and explained its conclusion as follows:

The evidence intended to illustrate a lack of diligent effort by Metzger, however, shows only that, for various reasons, more than six days were taken on some occasions to unload the cargo....

[S]everal exhibits showed that delays in offloading resulted because of malfunctioning equipment, delay by Offshore in preparing the jobsite, or waiting for the Corps to approve changes in the dredging site.

*Id.*

The question of whether the district court's unchallenged factual findings demonstrate a lack of "diligent effort" under the contract is a question of law subject to independent review by this court. *Cathbake Inv. Co.,* 700 F.2d at 656. Appellant has failed to draw our attention to any law or facts that persuade us that the district court was incorrect to find that the reasons for the delays do not demonstrate a lack of "diligent effort" by Metzger—at least as that phrase is used in the type of towage agreement and under the facts involved in this case.

### B. *The Miller Act Claim*

The Miller Act requires government contractors to post payment bonds for the protection of all persons supplying "labor or material" in the prosecution of work provided for under certain federal construction projects. *See* 40 U.S.C. §§ 270a, 270b. Miller Act bonds provide to workers and contractors on federal projects a remedy similar to the protection available under state mechanic lien statutes and similar laws from which federal property is exempt. *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974). Under section 270b, persons may sue "for the sum or sums justly due" for "labor or material" used in the federal project.

The district court found that "standby time" is not "labor or material" under the Miller Act. That determination is a legal issue subject to independent review. *Id.* at 118, 94 S.Ct. at 2159. Eastern has argued with some force in this court that under the circumstances of this case "standby time"

is "labor or material" under the Miller Act. However, we need not reach this issue since appellant has failed to prove that payment is "justly due" for the standby time.

"[I]t was not the intention of Congress to extend or enlarge the liability of the surety [under a Miller Act bond] beyond the contractual or quasi-contractual obligations of the contractor who remains primarily liable." *United States ex rel. Harrington v. Trione,* 97 F.Supp. 522, 526 (D.Colo.1951). "There must be some legally sufficient reason to justify the use of *quantum meruit,* or any contractor upon seeing that he had made a bad bargain would seek compensation for the reasonable value of its services, and not the amount provided for in the contract." *United States ex rel. F.E. Robinson Co. of North Carolina v. Alpha-Continental,* 273 F.Supp. 758, 777 (E.D.N. C.1967), *aff'd,* 404 F.2d 343 (4th Cir.1968).

■ As stated above, we discern no error in the district court's judgment that Eastern failed to prove by a preponderance of the evidence that Metzger breached the contract. The district court also found that Eastern is not entitled to *quantum meruit* recovery under the Miller Act.

■ Liability under the doctrine of quasi-contract arises by implication from the specific facts and circumstances unique to each case. *Id.* Although the remedy of *quantum meruit* was developed as part of the common law of contracts to avoid unjust enrichment under a contract implied by law, equitable considerations influence the determination of whether recovery is warranted in a given case. *Constantino v. American S/T Achilles,* 580 F.2d 121, 123 n. 2 (4th Cir.1978) (citing 12 Williston on Contracts § 1485, at 307 (Jaeger ed. 1970)) (in turn quoting *Wellston Coal Co. v. Franklin Paper Co.,* 57 Ohio St. 182, 48 N.E. 888, 889 (1897)). *See also* Black's Law Dictionary 1119 (5th ed. 1979); E. Farnsworth, Contracts 98–99 (1982). The duty to pay arises not from the intent of the parties but from the law of natural justice and equity.

We agree with the district court that Eastern is not entitled to *quantum meruit* recovery since Eastern chose to reap the benefits of completing the contract and accepting an extension on the same terms rather than pursuing its right, assuming one could be implied under the contract, to be compensated for standby time in excess of six days on each trip regardless of Metzger's diligence in unloading the stone. The record reflects that Eastern neither stopped its performance nor reserved its right to do so. Even assuming *arguendo* that Metzger's attempts to rectify the delays did not completely relieve the financial strain of the delays in excess of six days, Eastern elected its remedy and cannot complain that it should be compensated in *quantum meruit* under the Miller Act. *United States ex rel. Harkol, Inc. v. Americo Constr. Co.,* 168 F.Supp. 760, 761 (D.Mass.1958). *See also,* Annotation, *Quantum Meruit Recovery by Subcontractor Under Miller Act,* 26 A.L.R.Fed. 746, 762–63 (1976). *Cf. H.B. Zachry Co. v. Travelers Indem. Co.,* 391 F.2d 43, 48 (5th Cir.1968) ("[subcontractor] 'entitled to choose between the prize of further employment with the pecuniary and other advantages that may flow from it, and the prize of freedom from [its] own liabilities under the contract' ")[14] (quoting 5 Williston on Contracts § 688, at 302 (3d ed. 1961); *Id.* at § 687, p. 292; § 695, p. 336 (laches can bar equitable remedy used to enforce a legal right).

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

JOHNSON, Circuit Judge, dissenting:

I dissent. The majority has ignored the six-day-off-loading provision of the contract, denying the plaintiff the benefit of this bargained-for provision.

#### A. *Contract Claim*

The parties agree that the contract in the present case was for towage, and as such

14. The *Zachry* case held that a promisor under a contract subject to the Miller Act loses his defense for nonperformance if he performs despite a known excuse for nonperformance.

should be construed under federal common law. The interpretation of a contract is a question of law, reviewable *de novo* by this Court. *International Bhd. of Boilermakers v. Local Lodge D111*, 858 F.2d 1559, 1561 (11th Cir.1988). The district court's determination that a contract is ambiguous is also a question of law. *Id.* A contract term is ambiguous if it is reasonably susceptible to more than one interpretation. *Id.* Under federal common law, parol evidence is admissible to prove the meaning of ambiguities in the contract language. *United States ex rel. Garrett v. Midwest Constr. Co.*, 619 F.2d 349, 352 (5th Cir. 1980).

The district court found that the contract did not explicitly provide for standby time, but held that it was "unable to conclude that the standby provision of the contract at issue is ambiguous." This holding is contradictory and does not adequately explain the six-day-off-loading provision. The contract does contemplate the possibility of delay in off loading and states that Metzger will use diligent efforts to off load within six days. This provision places the burden of avoiding delays on Metzger. The contract does not go on, however, to provide what will happen in the event of a delay of more than six days that is caused by Metzger's lack of diligence.[1] Accordingly, the contract is ambiguous on the issue of the plaintiff's remedy for a breach of the six-day-off-loading provision. The district court erred, therefore, in not looking to extrinsic evidence of the parties' intent. *Garrett*, 619 F.2d at 352.

The extrinsic evidence of intent included testimony that industry custom was for the purchaser of towing services to pay for standby time. There was also testimony that Metzger received a lower contract price by assuring Eastern that off loading would take less than six days. This evidence indicates that Metzger assumed the risk of loss accruing from off loading time in excess of six days. *Cf. United States ex rel. Llewellyn Mach. Corp. v. Nat'l Surety Corp.*, 268 F.2d 610, 611 (5th Cir.1959) (where contract provided that contractor assumed the risk of loss, and the contractor received a lower rental cost as a result, loss was chargeable to the contractor).

The district court also held that, even if the contract did require standby time payments in the event that Metzger's lack of diligence caused a delay of more than six days, Eastern failed to prove such a lack of diligence. The court found that Metzger's failure to get the site prepared on time for the first shipment, the breakdowns in Metzger's equipment, and the delays in obtaining the Corps' approval of changes in the dredging site caused the delays. This application of the contract to the facts is erroneous. The delays described by the district court were all attributable to Metzger. Metzger should not be permitted to shield itself from liability by citing its own failure to prepare the job site on time, maintain its equipment in working order, or ensure an adequate supply of materials. *Cf. United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 675 (11th Cir.1987) (prime contractor not liable for delay where contract with subcontractor contained a "no damages for delay" clause). Implicit in the six-day-off-loading provision was Metzger's promise to be prepared to off load when the Southern Miss arrived. Accordingly, the district court erred in relying on delays of Metzger's own making in holding that Eastern had failed to show a lack of diligence.[2]

### B. *Miller Act Claim*

The Miller Act provides in part:

---

**1.** The court may award relief in quantum meruit for work outside of the terms of the contract. *United States ex rel. C.J.C., Inc. v. Western States Mech. Contractors, Inc.*, 834 F.2d 1533, 1538 (10th Cir.1987).

**2.** Metzger also argues that Eastern waived its breach of contract claim by continuing performance after the delays. Eastern, however, complained to Metzger at the time of the delays, and

Metzger acknowledged the problem and assured Eastern that it would make up the time if Eastern completed performance. In the end, however, Metzger never made up for the delays as promised. This argument by Metzger, therefore, has little merit. *See Autrey v. Williams and Dunlap*, 343 F.2d 730, 737, *modified,* 346 F.2d 1007 (5th Cir.1965).

Every person who has furnished labor or material in the prosecution of the work provided for in [a federal public works project] who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him ... shall have the right to sue on [the general contractor's] payment bond for the amount ... unpaid at the time of institution of such suit....

40 U.S.C.A. § 270b.

The Supreme Court has stated that the Miller Act is " 'highly remedial [and] entitled to a liberal construction and application in order to properly effectuate the Congressional intent to protect those whose labor and materials go into public projects.' " *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 124, 94 S.Ct. 2157, 2162, 40 L.Ed.2d 703 (1974) (quoting *MacEvoy Co. v. United States ex rel. Tomkins Co.*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944)); *see also United States ex rel. Krupp Steel Prods. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir.1987).

In *Krupp*, this Court stated that there are four elements necessary to a claim under section 270b:

(1) that materials were supplied for work in the particular contract at issue; (2) that the supplier is unpaid; (3) that the suppliers had a good faith belief that the materials were for the specified work; and (4) that jurisdictional requisites are met.

*Krupp*, 831 F.2d at 980. In the present case, standby time, rather than materials, was supplied to Metzger. The district court, however, found that standby time is not compensable under the Miller Act.

The district court cited *United States ex rel. Edward E. Morgan Co. v. Maryland Cas. Co.*, 147 F.2d 423 (5th Cir.1945), in support of its holding. In *Morgan*, a subcontractor had been hired to complete a levy. In the middle of the project, the government agent in charge of the project ordered the subcontractor to halt work, but not to remove his equipment from the site.

The subcontractor's equipment remained at the work site for thirty-one days before the contract eventually was cancelled. The subcontractor sued under the Miller Act for the rental value of the equipment for this period. The Fifth Circuit held that the subcontractor could not recover because the idle time was not necessary for completion of the contract and was not within the contemplation of the parties at the time of contracting. *Id.* at 425.

In the present case, however, standby time benefitted the project by ensuring Metzger an uninterrupted supply of stone and thereby speeding completion of the project. The contract stated that Metzger would make diligent efforts to off load the stone within six days. The contract also provided that Eastern would make diligent efforts to complete the round trips to Kentucky within fifteen days. These provisions indicate that time was material to both parties. By including these provisions, the parties expressed their intention to limit idle time, and the consequent wasted money, during the contract. Eastern's standing by was consistent with this purpose.

Courts have held, moreover, that rental time is compensable under the Miller Act. *See, e.g., Llewellyn*, 268 F.2d at 611 (rentals recoverable under Miller Act); *United States ex rel. Carlisle Constr. Co. v. Coastal Structures, Inc.*, 689 F.Supp. 1092, 1098, 1099 (M.D.Fla.1988) (allowing recovery for "waiting time" and finding rentals for period after initial contractor was fired are recoverable against surety); *United States ex rel. Carter–Schneider–Nelson, Inc. v. Campbell*, 293 F.2d 816, 818 (9th Cir.1961) (awarding rentals for period that Lessor's equipment was located at the work site).

These cases indicate that the term "labor or materials" in the Miller Act should be construed broadly. The district court's holding that the standby time is not labor or materials within the meaning of the Act is an overly restrictive interpretation of the Miller Act. The Miller Act covers services that are performed to benefit a government project. *See Rich*, 417 U.S. at 124, 94

S.Ct. at 2162 (Act should be liberally construed to accomplish its remedial purposes). Accordingly, I would hold that the district court erred in holding that Eastern cannot recover under the Miller Act.

## CONCLUSION

I would reverse the district court's holding that Eastern cannot recover for standby time and remand for a determination of damages.