UNITED STATES of America for and on
Behalf of CARLISLE CONSTRUCTION
CO., INC., Plaintiff,

v.

COASTAL STRUCTURES, INC., and
Dependable Insurance Company,
Inc., Defendants.

No. 86–783–CIV–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

March 21, 1988.

Lynn James Hinson, Dean, Mead, Egerton, Bloodworth Capouano & Bozarth, Orlando, Fla., for plaintiff.

James S. Lupino & Frank Mendez, Miami, Fla., Alan C. Brandt, Jr., Ft. Lauderdale, Fla., for defendants.

## ORDER

FAWSETT, District Judge.

This case was tried by the Court sitting as jury on January 13, 1988. After hearing the testimony and observing the demeanor of the witnesses, reviewing the evidence and the law, and being otherwise duly advised, the Court enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Plaintiff Carlisle Construction Company, Inc. ("Carlisle") filed a Three Count Complaint which sought damages against Defendant Dependable Insurance Company, Inc. ("Dependable") in Count One pursuant to the provisions of the Miller Act, 40 U.S. C. Section 270a *et seq.*, and in Count Three based on *quantum meruit.* In Count Two of the Complaint, Carlisle sought damages against Defendant Coastal Structures, Inc. ("Coastal"), for breach of contract. Coastal is also a defendant under the Miller Act claim.[1] At the trial of this action, Dependable made an *ore tenus* motion to dismiss without prejudice its cross-claim against Coastal and its third party claim against Third Party Defendants Gary J. McGeddy and Roxanne McGeddy, which motion was granted.

This case involves a crane owned by Carlisle which was used at a Naval construction project located in Andros Island, Bahamas. Until August 12, 1986, Coastal was general contractor for the Andros construction project, and Dependable acted as surety for Coastal. (Plaintiff's Exhibit 6).

On May 19, 1986, Coastal executed an Equipment Rental Agreement with Carlisle whereby Coastal rented a crane from Carlisle. Pursuant to this Agreement, Carlisle caused the crane to be transported to the Port of Palm Beach where it originally was to be loaded onto a Coastal barge and transported to the Florida Keys for a construction project. However, upon arrival in the Port of Palm Beach, the crane was loaded on a barge and was instead taken by Coastal to the Andros Island project. The crane arrived at Andros Island on June 12, 1986 and was unloaded on June 18, 1986 (Deposition of Engleberth, page 21). The crane was utilized by Coastal in the project construction prior to Coastal's termination

1. Before the trial in this matter, the Court granted summary judgment for the Plaintiff on the issue of liability on Plaintiff's breach of contract claim and its Miller Act claim. A trial was held to determine the amount of damages under those claims and to determine liability and damages under Plaintiff's quantum meruit claim.

as general contractor of the project on August 12, 1986.

Subsequent to the termination of Coastal as general contractor, Dependable entered into a takeover agreement with the Navy and commenced to complete the construction required pursuant to the provisions of the contract previously entered between Coastal and the Navy. To accomplish its obligations under this contract with the Navy, Dependable entered into a contract completion agreement with a subcontractor, Piling and Structures, Inc., for completion of a portion of the contract which required use of a crane. Thereafter, Piling and Structures, Inc. entered into an Equipment Rental Agreement with Carlisle under which Piling and Structures, Inc. was authorized to use the Carlisle crane to complete the work designated under the contract between Piling and Structures, Inc. and Dependable.

Piling and Structures, Inc. used the Carlisle crane on the Andros project beginning November 21, 1986 for approximately fifteen days and had the crane in its possession until January 28, 1987 (Deposition of Thaggard, page 16). Upon completion of its work utilizing the crane, Piling and Structures, Inc. caused the crane to be transported from Andros Island to Jacksonville, Florida where it was returned to Carlisle.

The Equipment Rental Agreement between Carlisle and Coastal provided for rental of the crane at the rate of $6,500 a month.[2] (Plaintiff's Exhibit 2). The contract also provides for an inland transportation charge of $7,000 consisting of $3,500 to get the crane into the position of assembly from Orlando to the Port of Palm Beach and $3,500 to get the crane out of the position of assembly from the Port of Palm Beach to Orlando.[3] This charge was related to the cost of eight or nine lowboy loads to transport the units of the crane to the delivery site and the cost of the employees required for this transport.

Under the contract heading "Special Provisions", the parties agreed that Coastal would pay to Carlisle $3,000 as the cost of erection and $3,000 as the cost for dismantling. The erection of the crane involved a rigging crew of five to six people and one 80 ton crane or two 40 ton cranes to lift the crane in question off the truck at the delivery site and to assemble it. To assemble the crane, a task which Carlisle agreed to perform, required approximately one and a half to two days of time. Dismantling of the crane involved the same procedure in reverse.

The contract also provides under "Terms of Payment" that a service charge of one and a half percent of the unpaid balance computed monthly or the maximum rate allowed by law, whichever is less, would be added and that any expense incurred in collecting the delinquent rental payment, included but not limited to court costs and attorney fees, would be paid by Coastal.[4]

Finally, the contract provided that all applicable taxes would be paid by Coastal.

When the disassembled crane was delivered to the Port of Palm Beach by Carlisle, additional time was incurred in unloading the crane due to initial misdirection to an improper dock. While the contract provided under "Transportation Charge" that two hours of standby time for unloading would be included, additional time was specified to be charged at the rate of $75.00 per hour. The charge for the additional time incurred by Carlisle was $1,046.25.

2. The Agreement provides for a three month guarantee of rental.

3. The original inland transportation charge did not include charges for transportation from Florida to the Bahamas. The actual contract provided that the crane would be used for construction in Islamorada located in the Florida Keys. Since the crane could not be transported by road to the Florida Keys, Coastal and Carlisle orally agreed that the crane would be transported to the Port of Palm Beach and would then be transported by barge at Coastal's expense to the intended construction site at Islamorada, which is designated in the contract as "South of Marathon at mile marker 78". By this oral agreement, the parties effectively modified the contract.

4. The parties to this cause stipulated that the amount of attorney fees would be determined in a subsequent proceeding.

Additionally, Carlisle was required to pay on behalf of Coastal a charge in the amount of $3,090.23 for use of the dock at the Port of Palm Beach for loading the barge,[5] so that the crane could be transported to its destination.

Gary Daniel Hoffman, Vice President of Sales for Carlisle, testified that the rental period for this crane began on June 2, 1986 and that on August 11, 1986 Carlisle received a letter from Coastal dated August 7, 1986 (Plaintiff's Exhibit 3) in which Coastal assured that the cost of mobilization and demobilization of the crane and other obligations under the contract would be honored. Hoffman testified that he heard second hand in late August or early September of 1986 that Coastal had been terminated from the construction job in Andros Island. Coastal did not contact Carlisle about return of the crane either before or after its termination as general contractor on this project.

The Carlisle crane was left on Andros Island after Coastal vacated the project. This crane, a Manitowoc 4000W Crawler, had a 150 ton lift capacity, had a boom in excess of 300 feet, and weighed 400,000 pounds. It was used on large construction projects and was worth approximately $350,000 at the time of its rental to Coastal. Beginning in the last week of August, Hoffman began efforts to locate Blue Water Insurance in order to obtain the return of the crane and at the same time had discussions with Mr. Dan Love of Dependable which was taking over the function of its principal, Coastal, as general contractor of this project. Love encouraged Carlisle to leave the crane on the jobsite so that it could be utilized under the completion contract and suggested that Carlisle enter a contract with the subcontractor which Dependable would hire for the work which would employ the use of this crane.

At the end of September or early October, 1986, Piling and Structures, Inc. advised Mr. Hoffman that it was being considered as a replacement subcontractor by Dependable and inquired whether Carlisle would enter a contract with Piling & Structures for completion of its portion of the project using the Carlisle crane located at Andros Island. As noted above, an Equipment Rental Agreement was entered between Carlisle and Piling and Structures, Inc. dated November 11, 1986, for the use of this crane. As part of the undertaking between Carlisle and Piling and Structures, Inc., Piling and Structures agreed to return the crane to the Port of Jacksonville where Carlisle would dismantle the crane for transportation to Orlando. Carlisle agreed to pay Piling and Structures $10,000 for this delivery, and Piling and Structures agreed to pay Carlisle one month's rental in the amount of $6,500 for use of the crane. The crane was utilized in the completion of the project by Piling and Structures, Inc. as subcontractor to Dependable, the Surety which took over and completed the project on Andros Island after termination of Coastal as general contractor.

A summary of the charges incurred by Carlisle for which it received no payment from Dependable or Coastal, exclusive of attorneys fees, is as follows:

| | | |
|---|---|---|
| 1. | Six months rental from June 6 to December 1, 1986 at the rate of $6,500 per month exclusive of sales tax | $39,000.00 |
| 2. | Five percent sales tax for such rental | $ 1,950.00 |
| 3. | Inland freight from Orlando to the Port of Palm Beach and from Jacksonville to Orlando in the amount provided under the contract | $ 7,000.00 |
| 4. | Five percent sales tax on the above | $   350.00 |
| 5. | Erection of crane | $ 3,000.00 |
| 6. | Delay in selecting proper site for assembly by Coastal | $ 1,046.25 |

5. According to Gary Daniel Hoffman, Vice–President of Sales for Carlisle, in order to obtain release of another Carlisle crane under the control of Coastal, Carlisle was required to pay this loading charge. Hoffman also testified that this was a loading fee owed by Coastal. Gary Joseph McGeddy, President of Coastal, testified that he thought this fee was a storage fee for another crane. However, John Brian Carlisle, branch coordinator for Carlisle's Orlando branch testified that this was a loading charge for loading the crane involved in this case from dock to barge for its trip to Andros Island. The Court resolves these conflicts in favor of Plaintiff.

| | | |
|---|---|---:|
| 7. | Loading fee incurred by Carlisle on behalf of Coastal | $ 3,390.23 |
| 8. | Dismantling fee | $ 3,000.00 |
| 9. | Charge for return ocean freight from Andros Island to Jacksonville | $10,000.00 |
| | Subtotal | $68,736.48 |
| 10. | Interest calculation | $15,805.15 |
| | **TOTAL** | $84,541.63 |

Although it is undisputed that Coastal did not advise Carlisle of its termination from the contract for construction in Andros Islands, Hoffman contacted the President of Coastal, Gary J. McGeddy, at the end of August in order to arrange for the return of the crane when he had learned either through Commander Cahill of the Naval project or Dan Love of Dependable of such termination. It is undisputed that Coastal was financially unable to attain Blue Water Insurance for return of the crane and further, that its barge was not seaworthy for purposes of return of this equipment.[6] In view of the cost to obtain return of the crane and the substantial probability that a completion contractor would use the crane in order to complete the contract of Coastal, Carlisle did not elect to advance the funds to obtain return of the crane but instead elected, with the knowledge and support of Dependable, to enter a successive contract for use of the crane on the Andros Island Naval project.

**6.** While Carlisle carries insurance, its insurance coverage has a Blue Water Exclusion. The cost to return the crane was estimated to range between $20,000 to $30,000 based on quotes obtained by McGeddy and Hoffman during this period.

**7.** Although the $10,000 return fee charged by Piling & Structures was not contained within the contract, the fee was necessary in order to obtain return of the crane to Florida in accordance with Coastal's contractual obligation, as modified by agreement between Coastal and Carlisle. *See supra* note 3.

**8.** Coastal contends that Blue Water Insurance is not required by the Equipment Rental Agreement. However, the Agreement provides under "Insurance" that the lessee (Coastal) shall at its cost maintain "Contractor's all risk physical damage insurance...." Furthermore, under the section labelled "Special Provisions", the Agreement states "Lessee to provide *full* insurance coverage,...." (emphasis added).

## CONCLUSIONS OF LAW

■ Carlisle has brought suit against Coastal both for breach of contract and for recovery under the Miller Act. With respect to the breach of contract claim, Carlisle has proven damages of $84,541.63 which the Court will award in its favor.[7]

Coastal asserts that the rental payments due should be limited to $19,500.00, for the period between June 2, 1986, and August 12, 1986, based on Carlisle's failure to mitigate damages. Carlisle, however, on these facts properly mitigated its damages. The evidence indicated that the Blue Water Insurance for return of the crane would alone cost $20,000 to $30,000. Had Carlisle elected to have the crane returned, this cost would have been chargeable to Coastal.[8] Accordingly, it was reasonable for Carlisle to leave the crane on the jobsite in order to obtain another rental. The rental payments that thereby accrued were necessary in order for Carlisle to mitigate its total damages as required under Florida law. *See Young v. Cobbs,* 110 So.2d 651, 653 (Fla.1959) (lease of real property). Additionally, Coastal had neither cancelled the lease,[9] nor loaded the equipment on a vehicle for return,[10] and it is therefore particularly appropriate to hold Coastal liable for the full six month rental.

**9.** The Equipment Rental Agreement, in paragraph 10 of the Terms and Conditions, provides that the lessee can cancel the Agreement for any reason on seven days notice.

**10.** The Agreement states in the Terms and Conditions:

1. **Rental Period.** If equipment is delivered by Lessor, the rental period starts upon arrival of equipment to the jobsite and ends when equipment is loaded on vehicle for return. If equipment is picked up by Lessee, the rental period shall cover all time consumed in transporting the equipment.

Under the best of circumstances then, the rental period would run until the crane was loaded on a vehicle for return.

Coastal contends that it was prohibited by injunction and by Carlisle from returning the crane. However, Coastal never actually cancelled the lease. Furthermore, as explained in the text, Coastal benefited from not being held liable for the $20,000 to $30,000 of Blue Water Insurance coverage cost.

Carlisle seeks to recover these same damages against Dependable under the Miller Act and in *quantum meruit*. As to this Defendant, there is an issue as to the amount of damages available to Carlisle under its Miller Act claim. Dependable asserts that although it may properly be held liable for part of Carlisle's contractual damages, certain elements of Carlisle's damages are not related to the furnishing of labor or materials and so are not recoverable under the Miller Act. In particular, Dependable objects to: (1) part of the transportation and assembly charges; and (2) rental payments arising after termination of Coastal by the Navy.[11]

The Miller Act provides for the recovery of sums "justly due" a supplier of labor or materials. The purpose of the Act is clear. As stated by the Supreme Court:

> The purpose of the Act was to provide security for the payment of all persons who provide labor or material on public work. This was done by giving a claim under the bond in lieu of the lien upon land and buildings customary where property is owned by private persons. Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress as declared in the act. In every case which has come before this court, where labor and materials were actually furnished for and used in part performance of the work contemplated in the bond, recovery was allowed, if the suit was brought within the period prescribed by the act.

*Illinois Surety Co. v. John Davis Co.*, 244 U.S. 376, 380, 37 S.Ct. 614, 616, 61 L.Ed. 1206 (1917).

Where a claim is for the purchase cost of materials such as physical inputs to be used in construction, the elements that must be proven by a Plaintiff are also certain:

> Four elements must be proven by a plaintiff to collect under Section 270b: 1) that materials were supplied for work in the particular contract at issue; 2) that the supplier is unpaid; 3) that the supplier had a good faith belief that the materials were for the specified work; and 4) that the jurisdictional requisites are met. *United States v. Avanti Constructors, Inc.*, 750 F.2d 759 (9th Cir.1984).

*United States ex rel. Krupp Steel Products, Inc. v. Aetna Insurance Co.*, 831 F.2d 978, 980 (11th Cir.1987). Such cases normally do not present novel questions of law but rather involve disputes over facts. The present case, however, involves the more difficult question of the extent of damages available under a breached equipment lease.[12]

■ The "rule" discernable from the case law with respect to the damages recoverable under the Miller Act is that amounts sought to be recovered must be related to the provision of labor or materials by a supplier. *United States ex rel. Lanahan Lumber Co. v. Spearin, Preston & Burrows, Inc.*, 496 F.Supp. 816, 818 (M.D.Fla.1980) ("[T]he remedy afforded by the Miller Act, as liberally construed, does not extend beyond the terms and coverage of the Act itself to include tort or contract claims unrelated to the provision of labor and materials."); *United States ex rel. Wyatt & Kipper Engineers, Inc. v. Ramstad Construction Co.*, 194 F.Supp. 379, 382 (D.Alaska 1961).

■ Courts look to various indicia to determine whether a claim is related to the provision of labor or materials. Important

**11.** Dependable does not dispute Carlisle's entitlement to pre-termination rental, erection and dismantling charges, applicable sales taxes, prejudgment interest, and a reasonable attorney's fee for the recovery of past due rent payments.

**12.** To the extent that the *Krupp Steel* test is applicable in this case, it has been met. Indeed, the second and fourth elements of this test are not disputed.

On the facts of this case, where the parties in effect modified their original agreement to allow the crane to be taken to the construction site and used to perform work under the applicable contract, element one would also appear to be met.

As to the third element, once the crane was taken to Andros Island, Carlisle certainly had a good faith belief that it was to be used for work under the contract, since the crane in fact was used for work under the contract.

factors include whether the particular expenditure sought to be recovered was necessary for performance of the contract and whether it was contemplated by the parties. For example, the Fifth Circuit has refused to award delay damages to a subcontractor against a prime contractor's surety where the subcontractor was forced to remain idle and incur costs by an action of the United States not chargeable to the prime contractor. The court said:

> In every instance, however, where recovery was allowed on the bond, the outlay for which recovery was sought was necessary for the performance of the contract and was within the contemplation of the parties to the contract. It is without dispute that the injury alleged to have been suffered here by the appellant [subcontractor] was not contemplated by the parties, but was totally unforeseen.

*United States ex rel. Edward E. Morgan Co. v. Maryland Casualty Co.*, 147 F.2d 423, 425 (5th Cir.1945).

■ Another important factor, in keeping with the principle of liberal construction in order to protect suppliers, is whether the surety receives the benefit of contractual provision under which recovery is sought. In *United States ex rel. Llewellyn Machinery Co. v. National Surety Co.*, 268 F.2d 610, 611 (5th Cir.1959), *cert. denied*, 361 U.S. 914, 80 S.Ct. 259, 4 L.Ed. 2d 184 (1959), the court reversed a lower court decision that a surety could not be held liable for the loss of rented equipment where the surety's principal, the general contractor, had contractually agreed to assume that risk. Although it was in no sense necessary for the general contractor to accept the risk of loss, the court believed that it was fair to impose liability on the surety. When a general contractor leases equipment and through arm's length dealings contractually agrees to assume certain obligations, the surety receives the benefit of that assumption through having its undertaking based on a lower rental payment.

*Id.* Thus, where the underlying provision of equipment is necessary for the performance of the contract, the surety can be held liable under any contractual provision which renders a benefit, directly or indirectly, to the surety.

In the present case, the transportation charges for which Carlisle seeks recovery [13] were necessary for performance of the contract of supply and for the underlying contract between Coastal and the Navy. A crane was required at Andros to complete construction. Although Coastal had not originally intended to use the Carlisle crane at the Andros site, under the circumstances the removal of that crane to Andros was the option chosen. Dependable benefited from provision of the crane in that a crane was taken to the Andros site to enable Coastal to continue work. Dependable further benefitted from each of the outlays for which Carlisle seeks recovery, as is hereinafter set forth, because such expenditures were required for Carlisle to supply the crane. Furthermore, the contract between Coastal and Carlisle was the product of arm's length negotiations between the parties, and so the charges contained in the agreement appear reasonable.

Dependable first contends that the $7000 charge for transportation for Orlando to Palm Beach, and from Jacksonville back to Orlando, must be reduced since the contract provides that this amount is to be charged for transportation to and from Mile Marker 78, just south of Marathon Key. However, the parties understood this charge as applying to transport to and from Palm Beach.[14] As to the return trip, the crane had to be picked up at Jacksonville instead of Palm Beach because of the actions of Coastal. The distances involved are similar. Accordingly, the $7000 charge will be awarded as necessary for provision of the crane to Coastal and within the contemplation of the parties.

13. Transportation charges are generally awarded under the Miller Act. *See Illinois Surety*, 244 U.S. at 383, 37 S.Ct. at 617; *United States ex rel. Benkart Co. v. John A. Johnson & Sons, Inc.*, 236 F.2d 864, 865 (3rd Cir.1956).

14. *See supra* note 3.

■ Similarly, the $10,000 charge owed to Piling & Structures from Carlisle may also be recovered under the Miller Act. Return of the crane was required by Carlisle in order for Carlisle to supply the crane. The parties contemplated that Coastal would pay return charges to Palm Beach. When Coastal was unable to return the crane, with the required insurance as provided by the contract, Carlisle properly arranged for the return of the crane and charged the cost to Coastal under the contract. Dependable received the benefit of this expenditure, because the crane was actually supplied only on the understanding that it would be returned, and because had the crane not been returned Dependable would have been liable.[15] Dependable further received the benefit of Carlisle's decision not to have Coastal return the crane, as if the crane had been lost, without insurance, Dependable would have properly been charged with its cost.[16] The price for return of the crane of $10,000, entered into through arm's length negotiations between Piling & Structures and Carlisle was reasonable.

Dependable asserts that Carlisle has improperly computed the $1,046.20 charge for waiting time under the contract. Given the subsequent agreement of the parties that transportation would be to Palm Beach, Carlisle has properly charged waiting time at Palm Beach instead of at the jobsite as was specified in the written contract. The $75.00 per hour computation is appropriate under the contract.

■ Carlisle may recover the wharfage charge of $3,390.23 from Dependable. Although this charge is not specifically delineated in the written contract between Carlisle and Coastal, the agreement does provide that the lessee shall be responsible for unloading the crane from the transport vehicle and reloading after completion. Such provision contemplates Coastal paying items such as wharfage charges where delivery and pick-up are not at the jobsite but rather in Palm Beach and Jacksonville, respectively. Thus, although this specific charge was not mentioned in the contract, the fact that such transportation charges were required in order to complete delivery clearly was contemplated by the parties. The testimony indicated that this charge was associated with the crane actually delivered to Andros Island, and so such charge was necessary for the provision of the crane. Finally, Dependable benefitted from Carlisle's payment of this charge in that its principal, Coastal, was temporarily relieved from the obligation to pay the fee.[17]

■ Dependable' second general objection is to rental payments accruing after the termination of Coastal on August 12, 1986, by the Navy. Dependable relies upon two cases which hold that once a subcontractor has been terminated, that subcontractor is no longer furnishing or supplying materials under the Miller Act. However, both cases are distinguishable. In *United States ex rel. Miller & Bentley Equipment Co. v. Kelley*, 327 F.2d 590, 591 (9th Cir.1964), the court was faced with the question of when a supplier to a terminated subcontractor was required to give notice to the prime contractor of nonpayment of amounts due from the subcontractor. Section 270b of the Miller Act provides *inter alia:*

That any person having direct contractual relationship with a subcontractor but no contractual relationship express or im-

**15.** *Ramstad,* 194 F.Supp. at 382. In terms of *Llewellyn Machinery,* had Coastal not been responsible for return of the equipment, Carlisle would have charged a larger transportation fee and perhaps higher monthly rentals. Accordingly, Dependable received the benefit of having its undertaking in a lower amount.

**16.** The contract provides "The Lessee hereby assumes and shall bear the entire risk of loss and damage to the equipment from any and every cause whatsoever." Plaintiff's Exhibit 2,

Terms and Conditions ¶ 4. Such provision is enforceable against a surety. *Llewellyn Machinery,* 268 F.2d at 611. The crane was worth approximately $350,000.

**17.** As the wharfage charge was associated with the crane actually delivered to Andros Island, had Carlisle not paid the charge Dependable would have been liable under the Miller Act for this amount to the stevedoring company. *Benkart,* 236 F.2d at 865.

plied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor *within ninety days from the date on which such person ... furnished or supplied the last of the material for which such claim is made....*"

(emphasis added). The court held that this ninety day period begins to run on the date the subcontractor is terminated, even if a reasonably prudent supplier would not have learned of the termination for some time thereafter, because: "After the termination of the subcontract equipment supplied to the subcontractor was not available for use on the project." *Miller & Bentley,* 327 F.2d at 591. Where the equipment was not available for use, it was not being furnished or supplied in accordance with the statute, and the ninety day notice period began to run.

Dependable contends that because termination of a contractor means that equipment supplied to that contractor is no longer available for use on the project, rental payments accruing thereafter cannot be recovered under the Miller Act. However, the court in *Miller & Bentley* expressly did not decide whether termination precludes recovery for rental payments accruing after termination.[18] The court simply found that had the subcontractor acted diligently, it would have learned of the date of termination within 90 days and could have given the notice required by the Miller Act.

In *United States ex rel. SGB Universal Builders Supply, Inc. v. Fidelity and Deposit Company of Maryland,* 475 F.Supp. 672, 674–675 (E.D.N.Y.1979), the court was also faced with a "subcontractor notice" problem, and followed the rule of *Miller &*

*Bentley.* However, in that case notice was timely given, and therefore the court was required to determine when the rental period ceased. The subcontractor had abandoned the job on September 23. The supplier learned of the termination shortly thereafter but left the equipment on the jobsite until March 28 of the following year. On these facts, the court held that the rental period terminated on September 23 because: "[T]he lessor can hardly be said to be 'furnishing or supplying' the equipment to a subcontractor who has deserted the project and has ceased to use the equipment." 475 F.Supp. at 674.

The Court will not apply *SGB Universal* to the facts of this case. In *SGB Universal,* it was clear that in mitigation of damages the supplier/plaintiff should have recovered the equipment immediately. Instead, the supplier allowed the equipment to stand idle on the jobsite, accruing unnecessary rentals. In contrast, Carlisle has acted to mitigate its damages and will be awarded post-termination rentals under the Miller Act. Had Carlisle elected to arrange for return of the crane, the cost would have been chargeable under the Miller Act to Dependable, since Coastal had assumed the obligation to return the crane and bore the risk of loss.[19] Carlisle minimized its damages by leaving the crane on the Andros site and not incurring a $20,000 to $30,000 insurance fee, thereby benefitting Dependable. It would be inappropriate on these facts to allow Dependable a windfall from Carlisle's diligent actions. Furthermore, it would be inappropriate to apply inflexibly the holding of *SGB Universal* to facts where its reasoning is not apposite.[20]

The Miller Act provides that every person who has furnished labor or material in the prosecution of work under a payment

18. The court stated that even if rental payments could accrue after termination, notice was still required to be given within 90 days of termination. 327 F.2d at 591.

19. *See supra* notes 15 & 16 and text associated therewith.

20. The Court's focus on mitigation of damages, rather than following the bright line rule of *SGB Universal,* that termination of a contractor ends the rental period for which a surety may be held

liable, is in keeping with Eleventh Circuit's rule that: "As long as there is good faith, 'under the law of this Circuit, delivery to the job site or actual use in the prosecution of the work is immaterial to a right of recovery.'" *Krupp Steel,* 831 F.2d at 980, *citing, Lanahan Lumber,* 496 F.Supp. at 818. In other words, as long as the supplier acts in good faith to mitigate damages properly chargeable to the surety and contractor, the expenses arising out of that mitigation are chargeable to both.

bond shall be allowed to recover for sums *justly due* him. Carlisle provided a crane and has brought suit for the sums justly due it. The statute requires no more.

Carlisle also contends that because Dependable agreed itself to complete Coastal's contract with the Navy, it can be held responsible for post-termination rentals. In this regard, Dependable's agreement with the Navy to complete the project begun by Coastal weighs toward a finding that, on these facts, the crane was still available for use on the project so as to impose liability under the Miller Act. In view of the Court's decision above, however, it is unnecessary to extensively discuss this argument.[21]

The Court finds that the Defendants, Coastal Structures, Inc. and Dependable Insurance Company, Inc., are jointly and severally liable to Plaintiff in the total amount of $84,541.63 exclusive of costs and attorney fees.

---

**21.** Carlisle also argues that it is entitled to recover in *quantum meruit.* The Court will not reach this claim.