**UNITED STATES DEPARTMENT OF the NAVY for the BENEFIT OF Milton ANDREWS and Milton Andrews, Plaintiffs,**

v.

**DELTA CONTRACTORS CORPORATION and Seaboard Surety Company, Defendants.**

Civ. No. 94–1145 (DRD).

United States District Court, D. Puerto Rico.

June 30, 1995.

Antonio M. Bird, Jr., Bird, Bird & Hestres, San Juan, PR, for plaintiffs.

Thomas Doran–Gelabert, Hato Rey, PR, for defendants.

### OPINION AND ORDER
### RE COLLECTION
### OF MONEY

DOMINGUEZ, District Judge.

This is an action for collection of money under the terms of certain payment bond issued by codefendant Seaboard Surety Company and surety for a Navy contractor Delta Contractors Corporation (hereinafter referred to as Delta). The cause of action arises under the provisions of 40 U.S.C. §§ 270(a)–210(d), The Miller Act, which grants a right of action against the surety issuing the payment bond to every person who has furnished labor or materials in the performance of work provided for in the contract for the construction, alteration or repair of any public building or public work of the United States. The Miller Act requires general contractors working on federal government projects to furnish a payment bond "for the protection of all persons supplying labor and materials." 40 U.S.C. § 270(a)(2)

The complaint was filed on February 4, 1994, and after discovery proceedings were completed, a Pre-trial conference was held on November 29, 1994. At the Pre-trial conference held in the case defendant Delta waived the affirmative defense concerning adequacy of the notice of claim required under 40 U.S.C. § 270b(a), (Docket No. 12 Pre-trial Conference Minutes). The controversy was principally limited by the parties to the defenses of prescription and estoppel claimed by Defendants.

The case came before the Court for a non-jury trial held on January 20 and 23, 1995. Documentary evidence was stipulated and also presented at trial by the parties. The court received the testimony of the plaintiff Milton Andrews and on the other hand that of Eng. Osvaldo De Varona and Angel Villalba, President and Project Manager, respectively, on behalf of Delta Contractors Corporation. Afterwards, the parties filed Post-trial Memoranda on February 10, 1995 (Plaintiff's Post–Trial Brief Docket No. 19) and February 21, 1995 (Defendants' Post–Trial Brief, Docket No. 20).

At the conclusion of plaintiff's case, defendants made a motion under the provisions of Fed.R.Civ.P. 50 which was granted by the Court relating to the special damages claimed based on repair of the crane. The Court concluded that although repairs were performed on the crane, and therefore related to the labor and materials, *U.S. ex rel. Lanahan Lumber Co. v. Spearin, Preston & Burrows, Inc.*, 496 F.Supp. 816 (M.D.Fla. 1980), Plaintiff did not properly substantiate the alleged $3,000.00 in expenses related thereto.

The matter now stands ready for resolution and in accordance with the evidence that was admitted, the stipulations of the parties as they appear in the Proposed Pre-trial Order and the credibility afforded the witnesses, the Court makes under Rule 52 of Civil Procedure the following

### FINDINGS OF FACT

1. At all times relevant to the instant action, Plaintiff Milton Andrews was and still is a natural person doing business as Milton Andrews (hereinafter called Andrews) engaged in the business of leasing cranes and other industrial heavy equipment used for construction.

2. At all times relevant to this action, defendant Delta Contractors Corporation was and still is a corporation organized under the Puerto Rico Corporation Law engaged in the business of construction in general.

3. At all times relevant to this action, defendant Seaboard Surety Company (hereinafter called Seaboard) was and still is a corporation engaged in the business of insurance in general.

4. On or about September 30, 1991, the U.S. Department of the Navy awarded Delta a contract to perform certain improvements to its facilities in Vieques, P.R. under the "YFU and Small Craft Landing," Contract Number N62470–91–C–1137.

5. Under the terms of the aforementioned Contract Number N62470–91–C–1137, Delta had an obligation to furnish a payment bond for the protection of all persons supplying labor and materials to the contractor or subcontractors.

6. On October 3, 1991, codefendant Seaboard issued its Payment Bond Number 2257518, with Delta as Principal and Seaboard as Surety.

7. Delta hired Pompano Construction Co. (hereinafter referred to as Pompano), as a subcontractor to perform certain works under the Navy contract.

8. On July 24, 1992, Pompano, through its President Mr. Mario Fantechi, verbally contracted Andrews to furnish, by way of lease, a crane to be used in the aforementioned Navy contract.

9. Under the terms of the agreed upon a lease contract between Pompano and Andrews, Pompano was to pay Andrews $5,000.00 a month, on a month to month basis for the term of the lease.

10. Also under the agreement, Andrews was to transport the crane from its facilities in Cataño, Puerto Rico to Roosevelt Roads in Ceiba, Puerto Rico. Pompano was responsible for its transportation to and from Roosevelt Roads, Ceiba, P.R., to Vieques, as well as for returning the crane to Andrews' facilities in Cataño, Puerto Rico, upon completion of the work in the Island of Vieques.[1]

11. On July 24, 1991, Andrews delivered the crane at the Roosevelt Roads Navy base in Ceiba, where it was received by Pompano to be transported on board a ferry to the construction site in the Island of Vieques.

12. Andrews delivered monthly invoices in the amount of $5,000.00 to Pompano pursuant to the lease contract through his employee Alberto González. Pompano was billed monthly, every thirty (30) days starting on August 23, 1992 to and including February 5, 1993 (Exhibit 1; A–H).

13. Andrews did not receive any payments from Pompano for the lease of the crane.

14. On December 2, 1992, Pompano, through its President Mr. Mario Fantechi, requested Delta that it make an advance to Andrews from the monies owed by Delta to Pompano. Delta consented to said advance.

15. On December 8, 1992, Delta made a partial payment in the amount of $10,000.00 to Andrews by check number 1918, reducing Pompano's debt to the amount of $26,166.58.

16. On December 15, 1992, Pompano filed a Petition for Bankruptcy before the Bankruptcy Court for the District of Puerto Rico, recognizing therein the amounts owed to Andrews for the lease of the crane.

17. Andrews sent a letter to Delta dated October 30, 1992 and its insurance agent dated 11 February 1993 prior to the filing of a state complaint advising Delta of Pompano's outstanding debt and default.

18. After Pompano ceased operations and filed bankruptcy, Delta continued to use Pompano's personnel and subcontractors.

19. In a letter dated January 13, 1993, the Navy informed Delta of the suspension of the works in the project effective January 23, 1993 (Ex. B).

20. In the same letter the Navy confirmed the suspension of the project work, Delta was informed of a potential time extension. The extension was in fact afterwards granted to Delta until the 27th of January, 1993 (Exhibit C of Defendant).

21. Delta continued to work in the project, and to use Andrews' crane, up to at least January 27, 1993[2], after taking control of the work once Pompano ceased to perform.[3]

22. When Andrews was notified of the suspension, he traveled to Vieques together with his personnel, to inspect the crane, and to make essential preliminary repairs needed to allow the machine to be safely boarded in the Navy Ferry for transportation from Vie-

---

1. The terms and conditions of the verbally agreed upon contract were established exclusively by the testimony of plaintiff Milton Andrews. The testimony was, thus, unrebutted.

2. Defendants' Post Trial Brief at p. 12 and 17. See also testimony of defendants' witness Osvaldo de Varona.

3. Delta paid the employees of Pompano and retained and paid the steel supplier used by Pompano.

ques to Roosevelt Roads. Specifically, on January 22, 1993, Andrews traveled to Vieques in order to attempt to board the crane on a Navy Ferry making the voyage from Vieques to Ceiba every Friday. The crane needed repairs in that it had flat tires and wheel studs were broken. The crane could not be boarded on the Ferry on this date because of the repairs that had to be done on the same.[4] On January 29 Andrews' personnel arrived early in the morning to repair the crane and when the ferry left Vieques they were still working on the repairs.[5]

23. The crane had to be transported in a Navy ferry that traveled from Vieques to Roosevelt Roads commercially available only on Fridays.[6] All arrangements had to be made, and were made by Delta as the general contractor for the Navy.

24. On February 5, 1993, the crane was transported in the Navy ferry from Vieques to Roosevelt Roads where it was picked up by Andrews.

25. After the end of the work in the project, the crane was not returned by Delta, Pompano, or anyone to the premises of Andrews in Cataño, Puerto Rico.

26. On February 11, 1993, Andrews sent a letter to Carlos M. Benítez, Delta's insurance agent, demanding payment and setting forth its claim for the unpaid services related to the lease of the crane.

27. On August 20, 1993, Andrews filed an action in the District Court of Puerto Rico, San Juan Section, Civil Action No. 93–10098(508) (State Court), for collection of the sum of $26,166.58 owed by Defendants Delta and Seaboard.

28. Delta and Seaboard were represented in the state action by the same attorneys as in the instant case, contested the service of process, and raised by way of affirmative defense in their answer to the complaint the lack of jurisdiction of the Puerto Rico District Court.

29. In the course of the state litigation, Andrews was provided copy of the Payment Bond issued by Seaboard.

30. Andrews filed a voluntary dismissal of the state action; afterwards, this federal action was filed on February 4, 1994.

### CONCLUSIONS OF LAW

The Miller Act, 40 U.S.C. § 270b, provides a federal cause of action for persons supplying labor or materials upon a payment bond secured by the principal contractor of a federal government project.

The Act authorizes a supplier who has a "direct contractual relationship with a subcontractor but no contractual relationship . . . with the contractor furnishing" the bond to sue on the bond for "the balance . . . unpaid at the time of institution" of the suit and to recover "judgment for the sum or sums justly due him." 40 U.S.C. § 270b.

■ The Act establishes a one-year statute of limitations for the commencement of the action, § 270b. The one (1) year period in which to bring suit under the Miller Act begins to run on the day after the last day on which labor or materials were supplied and ends in the next calendar year on date one day prior to starting date. *Bailey v. Faux,* 704 F.Supp. 1051 (1989).

■ Defendants assert that failure to retrieve the crane before February 5, 1993 bars plaintiff's right to recover for the amounts justly due under the lease agreement for the rental of the crane. Plaintiff, on the other hand, contends that the statute

---

4. Defendants' witnesses testified that in their opinion the crane could have been boarded in the Ferry. We credit Andrews statement, an expert in the field, over Defendant's Villalba who is not an expert on crane handling. Further, the matter of the condition of the crane on this date for ferry boarding purposes becomes academic when the crane was admittedly subsequently used in the project on January 27, 1993. The critical date then becomes the next Friday, January 29, 1993.

5. On January 29th, 1993 the crane could not be boarded on the Ferry. Andrews testified that the ferry was overloaded with Navy materials. Defendants' witness Angel Villalba admitted that when the ferry left, Plaintiff's mechanics were still attempting to fix the crane. No opinion was provided by Defendants as to the condition of the crane to board the ferry on this date.

6. The Navy Ferry operated other days of the week but was not available to the public.

of limitations began to toll on the date that the crane was in effect removed from the project site pursuant to the terms of the lease agreement which provided that the rental period would end at the return of the crane to plaintiff's facilities in Cataño, Puerto Rico.

The Miller Act provides for the recovery of sums "justly due" a supplier of labor or materials. The purpose of the Act is clear. As stated by the Supreme Court in *Illinois Surety Co. v. John Davis Co.*, 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206 (1918):

> "The purpose of the Act was to provide security for the payment of all persons who provide labor and material on public work. This was done by giving a claim under the bond in lieu of lien upon land and buildings customary where property is owned by private persons. Decisions of this Court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress as declared in the act. In every case which has come before this court, where labor and materials were actually furnished for and used in part performance of the work contemplated in the bond, recovery was allowed, if the suit was brought within the period prescribed by the act."

In *United States of America for and on behalf of Carlisle Const. Co., Inc. v. Coastal Structures, Inc.*, 689 F.Supp. 1092 (M.D.Fla. 1988), the Trial Court was faced with a similar situation. There the Court held that a lessor of a crane used at a Naval construction project who brought action against general contractor-lessee and surety, seeking damages under Miller Act and also seeking damages against general contractor for breach of contract, could recover from surety under the Miller Act for rental payments accruing after the termination of the general contractor lessee from the public works contract.

Enlightening to the resolution of the case at hand is the Court's interpretation of the lease agreement and the right to recover rental payments due. In *U.S. for Carlisle Construction Co.*, supra, the rental agreement provided specifically that the rental period started upon arrival of the equipment to the job site and ended when equipment was loaded on a vehicle for its return. Furthermore, it contained a clause that provided that if the equipment was picked up by the lessee, the rental period shall cover all time consumed in transporting the equipment. Carlisle left the crane on the job site for **six months** in order to obtain another rental agreement with someone else after it became aware that lessor had been terminated from the construction contract. The Court held that the rental payments that thereby accrued were necessary in order for Carlisle to mitigate its total damages as required under Florida Law. Additionally, at page 1096, the Court stated that:

> [...] Coastal had neither canceled the lease, nor loaded the equipment on a vehicle for return, and it is therefore particularly appropriate to hold Coastal liable for the full six months rental."

At Note 10 the Court explained that "[U]nder the best of circumstances then, the rental period would run until the crane was loaded on vehicle for return."

The Court in *Coastal*, supra, focused on the case of *United States ex rel. SGB Universal Builders Supply, Inc. v. Fidelity and Deposit Company of Maryland*, 475 F.Supp. 672 (E.D.N.Y.1979) wherein an interpretation was made of the rental period under the Miller Act. The subcontractor had abandoned the job on September 23. The supplier learned of the termination shortly thereafter but left the equipment on the job site until March 28 **of the following year.** On those facts, the Court held that the rental period terminated on September 23 because: "the lessee can hardly be said to be furnishing or supplying equipment to a subcontractor who has deserted the project and has ceased to use the equipment." 475 F.Supp. at 674. The facts in the instant case are clearly distinguishable.[7]

---

7. In the case at hand the crane was last used by the contractor on January 27, 1993 and remained in the project until February 5, 1993 only because it could not be transported to plaintiff for reasons not attributable to Andrews' fault.

Considering the case of *SGB Universal Builders* the Court in *Coastal Structures, Inc.,* supra, at page 1100, concluded that:

> "The Court will not apply *SGB Universal* to the facts of this case. In *SGB Universal,* it was clear that in mitigation of damages, the supplier/plaintiff should have recovered the equipment immediately. Instead, the supplier allowed the equipment to stand idle on the job site accruing unnecessary rentals. In contrast, Carlisle has acted to mitigate its damages and will be awarded post-termination rentals under the Miller Act. Had Carlisle elected to arrange for return of the crane, the cost would had been chargeable under the Miller Act to Dependable, since Coastal had assumed the obligation to return the crane and bore the risk of loss. Carlisle minimized its damages by leaving the crane on the Andros site and not incurring at $20,000.00 to $30,000.00 insurance fee, thereby benefiting dependable. It would be inappropriate on these facts to allow Dependable a windfall from Carlisle's diligent actions. Furthermore, it would be inappropriate to apply inflexibly the holding of *SGB Universal* to facts where its reasoning is not apposite.
>
> The Miller Act provides that every person who has furnished labor and material in the persecution of work under a payment bond shall be allowed to recover for sums justly due, Carlisle provided a crane and has brought suit for the sums justly due it. The statute requires no more."

Plaintiff established beyond any doubt that the lease called for and required Pompano, as subcontractor for Delta, to deliver the crane at the conclusion of the lease at the Naval Base in Roosevelt Roads. This evidence was unrebutted and never challenged by Defendants.

Plaintiff Andrews visited the project site for the first time on Friday, January 22, 1993. The crane could not be placed on board the YFU Navy Barge because in Mr. Andrews' expert assessment of the condition of the crane [which had certain bolts missing and flat tires] and his judgment there was a risk involved in attempting to load the crane on the barge on January 22. Furthermore, there was credible testimony to the effect that on January 22, 1993, Andrews and his personnel arrived before noon and were still working on the crane in Vieques when he left on board the ferry at around 3:00 p.m. in the afternoon.

The crane could not be removed on January 29, 1993 either. Delta had been using the crane throughout the week of January 25, 1993 and when Andrews personnel arrived on the 29th of January further repairs were necessary. When the barge arrived, there was no space on it to load the crane in question.[8]

Charging the contractor rent for the crane up to February 5, 1993 is warranted because Delta used the crane on January 27, 1993, the ferry from Vieques to Roosevelt Roads was only available on Fridays, and the crane could not be boarded on the ferry on Friday, January 29, 1993 either because the ferry was fully loaded or due to repairs that had to be performed on the crane; further the contract between Pompano and Andrews required the return of the crane to Andrews in Cataño, Puerto Rico. The crane was eventually returned to Andrews on February 5, 1993, at Roosevelt Roads (Ceiba) the immediate next Friday after the unsuccessful attempt of January 29, 1993. Since the last chargeable date for use of the crane is February 5, 1993, the cause of action is not time barred because of filing on February 4, 1994, *Bailey v. Faux,* supra.

The elements required under law to collect under 270(b) have been satisfied in the case: (1) That materials were supplied for work; (2) that the supplier is unpaid; (3) that the supplier had a good faith belief that the materials were for the specified work; (4) that the jurisdictional requisites are met. *U.S. v. Avanti Constructors,* 750 F.2d 759 (9th Cir.1984); *United States ex rel. Krupp Steel Products Inc. v. Aetna Insurance Co.,* 831 F.2d 978, 980 (11th Cir.1987).

Defendants' evidence and testimony which were directed essentially to show that the

---

8. Defendants testified that Plaintiffs were repairing the crane, both versions excused Plaintiff from neglect relating to the crane not being able to board the ferry on that date.

crane was in condition to be transported from Vieques to Roosevelt Roads at the time the U.S. Navy gave notice of the suspension of the contract work, and that the delay up to February 5, 1993 in the transportation was attributable to Andrews is unwarranted and unsupported by the evidence.

The Court further concludes that Delta failed to take precautionary measures available under the terms of the Subcontract agreement between Delta and Pompano, Sections 5.1.3, 5.1.4, 5.1.5, 5.1.6 and 5.3.2 which were designed by Delta to prevent potential economic situations such as the one in the case at hand.

On the other hand, Plaintiff Andrews adequately mitigated its damages. By undertaking obligations which under the lease agreement were attributable to Pompano, plaintiff prevented further accumulations in rents owed and potential further damages. On this matter, Note 20 of the *Carlisle,* opinion, supra, provides guidance:

"The Court's focus on mitigation of damages, rather than following the bright line rule of *SGB Universal,* the termination of a contractor ends the rental period for which a surety may be held liable is in keeping with the Eleventh Circuit rule that: 'As long as there is good faith, under the law of this Circuit, delivery to the job site or actual use in the prosecution of the work is immaterial to a right of recovery.' *Krupp Steel,* 831 F.2d at 980, citing, *Lanahan Lumber,* 496 F.Supp. at 818. In other words, as the supplier acts in good faith to mitigate damages properly chargeable to the surety and contractor, the expenses arising out of that mitigation are chargeable to both."

We summarize succinctly. The undisputed evidence established that Andrews rendered services to Pompano as subcontractor for Delta; Delta used the crane up and until January 27, 1993; that Andrews is owed the principal amount of $23,166.58; the crane was damaged and Andrews was forced to repair the same in order to enable transporting the same to Ceiba from Vieques; that it was not returned to Andrews facilities in Cataño, but rather left at Roosevelt Roads on February 5, 1993 where Andrews had to take

possession; that notwithstanding the fact that Andrews had no obligation to do so, upon notice from Delta of the order of suspension of work at the project site, it engaged in a mitigation effort to repair the crane and assist in its removal from the site; that Delta used and benefited from the crane, even after Pompano defaulted, had control of the equipment as well as of the transportation arrangements.

■ Sections 270a to 270b of Title 40 are remedial and are to be liberally construed, although giving notice and bringing suit within prescribed time are conditions precedent under the Act. This finding is in accord with the general purpose of the Miller Act, 40 U.S.C. Sec. 270a–f (1986), a remedial statute, enacted to assure that all workers and subcontractors on government projects receive last compensation for their efforts. See *F.D. Rich Co. v. United States for Use of Indus. Lumber Co.,* 417 U.S. 116, 124, 94 S.Ct. 2157, 2162–2163, 40 L.Ed.2d 703 (1974); *U.S. for Use and Ben. Of Luis A. Cabrera, S.E. v. Sun Engineering Enterprises, Inc.,* 10 F.3d 805 (1st Cir.1993).

Defendants also allege the defense of estoppel under the cases of *Graybar Electric Company v. John A. Volpe Construction Company,* 387 F.2d 55, 59 (5th Cir.1967); *Moyer v. United States for Use of Trane Co.,* 206 F.2d 57 (4th Cir.1953); *Trane Co. v. Whitehurst–Lassen Construction Company,* 881 F.2d 996, 1004 (11th Cir.1989); *United States v. Forrester,* 441 F.2d 779, 783 (5th Cir.1971); *U.S. for Use of Krupp Steel v. Aetna Insurance Company,* 923 F.2d 1521, 1526 (11th Cir.1991).

■ Defendant alleges that it relied upon Andrews assertions that the crane was to be returned from Vieques by Andrews modifying the obligations of the original lease contract. Defendant further avers that because Andrews failed in returning the crane on January 22, 1993, said date triggered the year statute of limitations period and Andrews is consequently stopped from using any other commencement prescription date and further Andrews is stopped from requesting the return of the crane. Delta's reliance on estoppel is misplaced. First, our

understanding of the testimony is not that the contract was novated by Andrews but that Andrews undertook to mitigate Pompano's default. Secondly, Delta underestimates that the crane was used after January 22, 1993 and, therefore, this date cannot be pivotal. As stated before the crane could not be loaded in the ferry the next Friday after January 27, 1993, because the ferry was fully loaded or because of repairs to the machine. The crane was then returned on Friday, February 5, 1993. Hence, the Court dismisses Defendants' theory of estoppel.

■ Plaintiff requests the imposition of lawyers' fees and pre-judgment interest. Lawyers' fees are not recoverable under the Miller Act. *F.D. Rich Co. v. United States Industrial Lumber Co., Inc.*, 417 U.S. 116, 128–129, 94 S.Ct. 2157, 2164–2165, 40 L.Ed.2d 703 (1974).[9]

■ On the matter of interest, the majority of Federal Courts have held that the right of interest is determined by the law of the state in which the work was performed. *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589 (10th Cir.1966); *American Surety Co. of N.Y. v. U.S. for Use and Benefit of B & B Drilling Co.*, 368 F.2d 475 (9th Cir.1966); *D & L Construction Co. v. Triangle Electric Supply Co.*, 332 F.2d 1009 (8th Cir.1964); *Aetna Cas. & Surety Co. v. B.B.B. Construction Corp.*, 173 F.2d 307 (2d Cir.1949) *cert. denied* 337 U.S. 917, 69 S.Ct. 1158, 93 L.Ed. 1726; *U.S. for Use of Yonker Const. Co. v. Western Contracting Corp.*, 935 F.2d 936 (8th Cir.1991); *U.S. for Use and Benefit of Seminole Sheet Metal Co. v. SCI Inc.*, 828 F.2d 671 (11th Cir.1987); *U.S. ex rel. Bartec Industries Inc. v. United Pacific Co.*, 15 F.3d 855 (9th Cir.1994). Pre-judgment interest under Puerto Rican law is firstly a matter of contractual agreement, 31 LPRA 4573, *Piovanetti v. Vivaldi*, 80 DPR 108 (1957). The Court received no testimony on any agreement between the parties as to

interest. However, the verbal contract in this case called for monthly billing and monthly payments. Defendants' arrears generate interest based on the breach of the payment obligation. 31 L.P.R.A. 3025; *Reyes v. Banco Santander*, 583 F.Supp. 1444 (D.P.R.1984). Plaintiffs are entitled to legal interest at the rate authorized by puertorican law [10] commencing on December 8, 1992 for any principal amounts owed in excess of thirty days in arrears. *Reyes v. Banco Santander*, supra, p. 1446.

WHEREFORE, IT IS ORDERED, DE-CREED AND ADJUDGED, that plaintiff Milton Andrews recover from defendants Delta Contractors Corporation and Seaboard Surety Corporation, jointly and severally, the principal amount of $23,166.58. Interest shall be paid on principal amount owed at December 8, 1992, commencing on said date until total payment thereof is made, in addition to the costs incurred in the prosecution of this action.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

---

9. Even should we follow the alternative of applying local Puerto Rican law, the Court would have to make discretionary findings of temerity and/or obstinacy which we decline. *Fernández v. San Juan Cement Co.* 118 D.P.R. 713 (1987).

10. Legal interest are established in Puerto Rico by the Finance Board of the Office of the Commissioner of Financial Institutions, See Local

Rule 44.3 of Civil Procedure. Rule 44.3 of Civil Procedure is both a procedural and substantive law. *Vélez v. Crown Life Insurance Co.*, 599 F.2d 471, 474 (1st Cir.1979). The legal interest established are the following: January 1994 to June 30 1994: 7%; July to December 31, 1994: 8.25%; January 1 to June 30 1995: 9.50%; July to December 31, 1995: 10%.