United States Court of Appeals,

Fifth Circuit.

No. 91–3094.

PREMIER BANK, NATIONAL ASSOCIATION, Successor in Interest to and Formerly Known as Louisiana National Bank of Baton Rouge, Plaintiff–Appellant,

v.

Robert H. MOSBACHER, Srcretary of the Department of Commerce of the USA, et al., Defendants–Appellees.

April 29, 1992.

Appeal from the United States District Court for the Middle District of Louisiana.

Before REAVLEY, JOLLY and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

Premier Bank, N.A. (Premier) sued the Economic Development Administration (EDA) of the United States Department of Commerce to collect on EDA's guarantee of a loan that Premier's predecessor made to Louisiana Chemical Polymers, Inc. (Polymers) and its president, William J. McFerrin. The district court found that Premier breached the Guarantee Agreement by modifying McFerrin's obligations on the loan, and that this breach released EDA from its obligation as guarantor. We affirm.


I. BACKGROUND

Polymers purchased two adjacent tracts in Baton Rouge, Louisiana, in November 1985. Louisiana National Bank, Premier's predecessor, made a $4,450,000 loan to Polymers (the Premier/IRB Loan), through an industrial revenue bond issued by the Louisiana Public Facilities Authority, to finance this purchase. Premier also provided a second loan for $2,550,000 (the Premier/EDA Loan) to finance Polymers' conversion of a plastics plant located on one of the tracts into a chemical processing facility. Polymers and McFerrin were co-obligors on the Premier/EDA Loan note. The parties executed these loan agreements on November 18, 1985. On November 20, EDA offered to guarantee eighty percent of the Premier/EDA Loan. Premier, Polymers, and

McFerrin accepted this offer, and the parties executed a Guarantee Agreement on November 22, 1985.

Polymers and McFerrin defaulted on both Loans, and Polymers filed bankruptcy on June 7, 1988, placing EDA at risk on its guarantee of the Premier/EDA Loan. EDA, however, suspected that Premier had breached the terms of the Guarantee Agreement by making incomplete and incorrect representations in connection with its application for EDA's guarantee. So in December 1988 EDA asked the United States Office of the Inspector General (OIG) to audit Premier's performance of its obligations under the Guarantee Agreement. The OIG began this audit on January 9, 1989.

On April 13, 1989, Premier sent a letter to EDA demanding payment under the Guarantee Agreement. EDA received this letter the following day. As required in Paragraph 9.1 of the General Terms and Conditions of the Guarantee Agreement, Premier attached to its demand letter Premier's plan for obtaining maximum recovery on the Loan. Premier noted in this "recovery plan" that, because Polymers filed for Chapter 11 bankruptcy relief, Premier's "options in administering this loan are limited by the bankruptcy code." Because of this limitation, combined with appraisal results showing Polymers' assets to be most valuable as a going concern, Premier's recovery plan proposed the complete sale of Polymers and its assets to a third party. The recovery plan briefly outlined the process that Premier intended to follow in effectuating this sale. Premier's demand letter also instructed EDA that, according to the Guarantee Agreement, EDA had sixty days from its receipt of Premier's demand to either: (a) require Premier to conduct the liquidation of the security, or (b) pay Premier the amount due.

Michael Oberlitner, Director of EDA's Liquidation Division, responded to Premier's demand on May 3, 1989, with a letter informing Premier that EDA "is unable to act upon the request for payment" until completion of the OIG's audit. On May 23, 1989, Premier sent a letter to Oberlitner in which Premier informed Oberlitner that the Guarantee Agreement did not give EDA the right to

delay its response to Premier's demand because of an ongoing OIG audit, and that EDA's proper response was due by June 13, 1989, sixty days after EDA received Premier's demand letter. The parties subsequently exchanged numerous letters, but EDA neither instructed Premier to conduct the liquidation nor paid the demand by June 13.

In the meantime, Premier filed claims and sought a valuation of Polymers' assets in Polymers' bankruptcy proceeding. Premier's role in this proceeding was complicated by its conflicting interests in obtaining from the sale of Polymers' assets the maximum recovery on both the Premier/IRB Loan and the Premier/EDA Loan. So Premier requested EDA to join the bankruptcy proceeding to ensure protection of EDA's interests, but EDA declined and instructed Premier that Premier was obligated to protect EDA's interests on EDA's behalf. On August 10, 1989, Premier filed a motion to join EDA in the bankruptcy court, but that court ruled that EDA was not an indispensable party and denied the motion.

On October 24, 1989, more than six months after EDA received Premier's demand for payment, Premier filed this suit against EDA. In its complaint, Premier alleged that EDA had failed to respond to Premier's demand as required by the Guarantee Agreement, and thus EDA had forfeited "its rights to require Premier to liquidate any collateral securing the indebtedness and/or to deny Premier's demand for payment...." Premier prayed for a judgment against EDA in the amount of eighty percent of all amounts due under the Loan.

While this suit was pending, Polymers' bankruptcy proceeding continued. On January 18, 1990, the bankruptcy court confirmed a plan (the Bankruptcy Plan) that called for Polymers to sell all of its assets and pay Premier $2.6 million, in exchange for which Premier was to release "any and all claims" that Premier had against Polymers, Polymers' assets, or McFerrin. The bankruptcy court attributed $755,740 of the $2.6 million to Polymers' assets that secured the Premier/EDA Loan, and the remainder to the security for the Premier/IRB Loan. EDA was notified of the Bankruptcy Plan

on that day and, although it questioned whether the Plan would effect a release of EDA's liability, it is not clear whether EDA expressly objected to the Plan.

Pursuant to the Bankruptcy Plan, Premier and McFerrin executed a document entitled "Release Agreement and Covenant Not to Sue" (the Release Agreement) on February 2, 1990. In the Release Agreement, Premier released McFerrin from liability for any and all claims that Premier may have had from the Premier/IRB Loan, and covenanted not to sue on any claim that Premier may have had against McFerrin on the Premier/EDA Loan. In return, McFerrin paid the $2.6 million to Premier and released any and all claims arising out of the two loans that he may have had against Premier. The Release Agreement includes four provisions that are particularly important to this case. First, the Agreement states:

> It is understood by Premier that McFerrin's acceptance of [Premier's release of claims associated with the Premier/IRB Loan] is in no way an acknowledgement by McFerrin that any such claim ever existed or exists, and to the extent that any such claim does exist without knowledge of McFerrin, McFerrin expressly denies any liability with respect thereto.

Second, the Agreement provides that "Premier does not intend this covenant not to sue [on the Premier/EDA Loan] to be a novation of the Premier/EDA Loan, and Premier specifically reserves its rights against all other endorsers, suret ies, guarantors and collateral for the Premier/EDA Loan." Third, the Agreement provides that "McFerrin specifically reserves his rights to establish that he is entitled to a full release of all claims of Premier and EDA on the Premier/EDA Loan." Finally, after referring to Premier's pending suit against EDA, the Agreement states: "McFerrin does not hereby admit liability to the EDA and specifically denies liability to the EDA."

On February 6, 1990, EDA informed Premier that EDA was exercising its right under Paragraph 13 of the Guarantee Agreement to terminate its obligation because Premier had breached the Agreement by making incorrect or incomplete representations in its guarantee application.[1] EDA

---

[1]Paragraph 13 of the General Terms and Conditions of the Guarantee Agreement provides in part that:

based these allegations on preliminary reports that it received from the OIG. The OIG did not complete its audit of Premier's performance until March 3, 1990.

EDA first learned the details of the Release Agreement on May 10, 1990. On July 3, EDA filed a third party complaint against McFerrin and amended its answer to Premier's complaint to assert as an affirmative defense the allegation that Premier had breached the Guarantee Agreement by releasing McFerrin from his obligations under the Premier/EDA Loan without first obtaining EDA's consent. Premier and EDA filed cross motions for summary judgment on this affirmative defense, and the district court orally granted EDA's motion and denied Premier's on December 7, 1990. On December 21, the district court entered final judgment for EDA and dismissed this case with prejudice.

On appeal, Premier argues that the district court erred in granting summary judgment for EDA because: (1) the evidence supports Premier's contention that it did not breach the Guarantee Agreement by entering into the Release Agreement with McFerrin; and (2) in any event, EDA's failure to respond to Premier's demand for payment as the Guarantee Agreement requires released Premier from its obligation to obtain EDA's consent to the Release Agreement.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Questions involved in our interpretation of the parties' contract are questions of law. *In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir.1981). We review the facts by considering the

> "EDA may, at its option and without further cause, terminate all or part of EDA's obligation under this Guaranty Agreement (and, if EDA has made any payments hereunder, may recover such payments) if [Premier] has:
>
> 13.1 Made any incorrect or incomplete representation in any material respect to EDA in connection with the Application for this Guaranty;
>
> 13.3 Failed to comply with all of the material provisions of this ... Agreement...."

record *de novo* and applying the same standards that guided the district court. *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1286 (5th Cir.1990). EDA is entitled to summary judgment if it demonstrates by pleadings, depositions, answers to interrogatories, admissions, and affidavits that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c). We draw all inferences most favorable to Premier to determine whether a rational trier of fact could find in Premier's favor. *Washington,* 901 F.2d at 1286. If so, a genuine issue exists, making summary judgment improper.

B. PREMIER'S BREACH OF THE GUARANTEE AGREEMENT

Paragraph 7.2 of the Guarantee Agreement provides that Premier shall not "agree to any modification of any obligation of any party to any agreement related to the [Premier/EDA] Loan, without the prior written consent of EDA." The district court found that Premier failed to comply with Paragraph 7.2 when it entered into the Release Agreement without first obtaining EDA's consent, and that Paragraph 13 thus allowed EDA to terminate its obligations under the Agreement. Premier argues that the district court erred for three reasons.

First, Premier contends that its execution of the Release Agreement did not constitute a failure to comply with Paragraph 7.2 because the Release Agreement did not in any way modify McFerrin's liability to *EDA.* Premier relies on the Restatement of Security's provision that:

> Where the creditor releases a principal, the surety is discharged, unless
>
> (a) the surety consents to remain liable notwithstanding the release, or
>
> (b) *the creditor in the release reserves his rights against the surety.*

RESTATEMENT OF SECURITY § 122 (1941) (emphasis added). Comment *d* to this section explains that, when the creditor reserves its rights against the surety while releasing the principal, the surety's right of subrogation against the principal is "technically preserved." Thus, Premier argues, Premier preserved EDA's rights against McFerrin by reserving its own rights against EDA under the

Guarantee Agreement. As a result, there was no modification for which EDA's consent was necessary.

We reject this argument because Premier specifically agreed to stricter restraints on modification than those provided by Section 122. Paragraph 7.2 unambiguously obligates Premier to obtain EDA's written consent prior to agreeing "to *any* modification of *any* obligation of *any* party to *any* agreement" related to the Premier/EDA Loan. Whether Premier effectively preserved EDA's rights against McFerrin under Section 122 is irrelevant to the question of whether Premier complied with Paragraph 7.2. Premier modified McFerrin's obligations under the Premier/EDA Loan by covenanting not to sue him on that Loan. Because it did not first obtain EDA's consent, Premier failed to comply with Paragraph 7.2.

Second, Premier argues that, as a compensated surety, EDA must show that it suffered prejudice or injury from Premier's modification of the Loan before EDA can be released from its obligations; and, even then, EDA is released only to the extent of that prejudice. *Basic Asphalt and Constr. Corp. v. Parliament Ins. Co.,* 531 F.2d 702, 703 (5th Cir.1976); *Development Corp. of America v. United Bonding Ins. Co.,* 413 F.2d 823, 826 (5th Cir.), *cert. denied,* 396 U.S. 957, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969). Whether the alteration resulted in prejudice is a factual question that precludes summary judgment. *Basic Asphalt,* 531 F.2d at 703. Premier contends that EDA cannot show prejudice from Premier's release of McFerrin because, under Section 122, Premier preserved EDA's rights against McFerrin by expressly reserving it's own rights against EDA.

We do not agree with Premier that EDA was required to show that it was prejudiced by Premier's modification of the Premier/EDA Loan. The prescription against modification that this court dealt with in *Basic Asphalt* and *Development Corp. of America* was imposed by general surety law. But Premier's obligation to obtain EDA's consent before agreeing "to any modification of any obligation of any party to any agreement related to" the Premier/EDA Loan arose from the Guarantee

Agreement and not merely from general surety law. This same Agreement, in Paragraph 13, gave EDA the right, "at its option and *without further cause,*" to terminate its obligations if Premier "failed to comply with [the Agreement's] material provisions."[2] The Agreement does not require EDA to show prejudice before asserting this right, and we think that the "without further cause" language forecloses the possibility of such a requirement.

Finally, Premier contends that a fact issue exists whether EDA impliedly consented to Premier's modification of McFerrin's obligations. Premier cites this court's statement that a guarantor's consent to the alteration of the principal's obligations "need not be in writing, and indeed ... may be found in the guarantor's course of conduct." *United States v. Vahlco Corp.,* 800 F.2d 462, 468 (5th Cir.1986) (footnotes omitted) (applying Texas law). Premier argues that, after Polymers filed bankruptcy, EDA told Premier that EDA wanted no input in Premier's decisions, that Premier was to "do it all," and that EDA would evaluate Premier's actions after Premier demanded payment. Thus, Premier contends, an issue exists whether EDA by its course of conduct granted Premier the authority to do whatever was necessary to obtain maximum recovery of the Loan, including its execution of the Release Agreement. But *Vahlco's* implied consent rule is inapplicable in this case because the Guarantee Agreement specifically required Premier to obtain EDA's "prior *written* consent." We thus reject Premier's contention that the existence of a factual issue over whether EDA impliedly consented to the modification of McFerrin's obligations precluded summary judgment.

In summary, we agree with the district court's decision that, regardless of whether Premier

---

[2]We agree with the district court's express holding that Paragraph 7.2 is a "material provision," because EDA's opportunity to consent (or refuse to consent) to any modification of agreements related to the Premier/EDA Loan was essential to EDA's ability to protect its interests as guarantor of that Loan. *See Macktal v. Secretary of Labor,* 923 F.2d 1150, 1156 n. 25 (5th Cir.1991) (defining a "material term" as one "that a party could not customarily change in a private agreement without the consent of the other parties to the agreement"). Premier argues that, because it preserved all of EDA's rights against McFerrin when it executed the Release Agreement, its *breach* of Paragraph 7.2 was not "material." But EDA's right to terminate its obligations under Paragraph 13 depends not on whether Premier's *breach* was material (i.e., prejudicial to EDA), but whether the *provision* with which Premier failed to comply was material. We agree with the district court that it was.

preserved EDA's rights against McFerrin or whether EDA was prejudiced by Premier's execution of the Release Agreement, Premier failed to comply with Paragraph 7.2 by modifying McFerrin's obligations without obtaining EDA's prior written consent.

C. EDA's PRIOR BREACH OF THE GUARANTEE AGREEMENT

Premier contends that its failure to comply with Paragraph 7.2 did not release EDA from its obligation as guarantor because EDA had already breached the Guarantee Agreement by failing to respond to Premier's demand for payment as required. The district court rejected this argument, stating simply: "although [Premier] argues that the EDA had previously violated the provisions of the Agreement because of its non-payment, the court finds otherwise."

Paragraph 9 of the Guarantee Agreement sets forth the parties' obligations in the event of the borrowers' default. Under Paragraph 9.1, Premier was required to submit a reasonably detailed recovery plan with its demand for payment, as well as all documents and certifications that EDA may require evidencing

Premier's compliance with the Guarantee Agreement. Paragraph 9 then provides:

> 9.2 EDA shall within sixty (60) days after receipt of such demand either (i) elect, by written notice to [Premier], to require that [Premier] conduct the liquidation of the security before being entitled to payment from EDA under this Guaranty Agreement, or (ii) pay to [Premier] the amount due at the date of such payment.

> 9.3 In the event that EDA elects to have the liquidation effected by [Premier] hereunder, [Premier] shall: (i) conduct such liquidation in accordance with the plan submitted by [Premier] and approved by EDA, (ii) submit monthly reports to EDA as to the progress of such liquidation, (iii) promptly report to EDA all material events in the course of such liquidation, and (iv) account to EDA as to the proceeds of such liquidation and expenses attributable thereto. EDA retains the option to modify any election made hereunder as to all or any part of the security. EDA shall not be obligated to make payment hereunder to [Premier] until the liquidation of the proceeds of all security for the Loan has been completed to its reasonable satisfaction, and shall then be obligated to pay to [Premier] that portion of the Loan guaranteed hereunder after the deduction of all proceeds of such liquidation less reasonable expenses attributable thereto.

Premier contends that the Guarantee Agreement required EDA to respond to Premier's demand within sixty days in one of three ways. Paragraph 9.2 provided the two options of: (1) requiring that Premier conduct the liquidation; or (2) paying the amount then due. Paragraph 13 provided EDA with the third option, under specified circumstances, of terminating its obligations. But EDA did not elect either of these options, and instead simply informed Premier that EDA was unable to respond until the OIG completed its audit.

We recognize that EDA was in a difficult situation. It could not require Premier to conduct the liquidation because the bankruptcy court was already doing this and, in any event, EDA was unsatisfied with the recovery plan that Premier submitted. And EDA did not want to pay the demand or terminate its obligations until it learned for certain from the OIG audit whether Premier had breached its obligations under the Guarantee Agreement. EDA's failure to respond, however, placed Premier in the equally difficult situation of deciding how to proceed in Polymers' bankruptcy proceeding without the benefit of knowing EDA's position on its guarantee. But regardless of the relative difficulties of the parties' situations, the question is whether EDA breached the Guarantee Agreement by failing to respond to Premier's demands as required, and, if so, whether this breach released Premier from its obligation to obtain EDA's consent before modifying McFerrin's obligations.

We decide that EDA breached the Guarantee Agreement by failing to respond to Premier's demand as Paragraph 9.2 requires, and we reject all of EDA's arguments to the contrary. We further decide that this breach was material. EDA's failure to respond deprived Premier of the timely payment or instructions to liquidate for which Premier bargained. As a result, Premier had to appear in the ongoing bankruptcy proceeding without the benefit of knowing whether it should protect EDA's interest as guarantor or protect only its own interests in light of EDA's refusal to pay.

We agree, however, with EDA that Premier affirmed the Guarantee Agreement and bound itself to the Agreement's terms by its conduct subsequent to EDA's breach. After EDA's failure to

respond to Premier's demand, Premier continued to pay EDA its quarterly guarantee fees, continued to assert (as it still asserts) that it has always been in full compliance with the Guarantee Agreement, and ultimately sued EDA for specific performance of the Guarantee Agreement. When one party materially breaches a contract, the non-breaching party may elect to either rescind the agreement or demand performance and sue for damages. By choosing to demand performance, as Premier did, the non-breaching party remains obligated to fulfill its promises in the agreement. *See H.B. Zachry Co. v. Travelers Indem. Co.,* 391 F.2d 43, 48 (5th Cir.1968); *Topps Chewing Gum, Inc. v. Imperial Toy Corp.,* 686 F.Supp. 402, 408–09 (E.D.N.Y.1988), *aff'd,* 895 F.2d 1410 (2d Cir.1989). Thus, Premier's conduct subsequent to EDA's failure to respond to Premier's demand prevents Premier from being released from its obligations under the Agreement.

Premier argues that EDA's breach is a basis not only for rescission of the contract, but also for finding that EDA is estopped from relying on Premier's subsequent breach to deny Premier's claim. Premier finds support for its estoppel argument in *ITT Industrial Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1341 (N.D.Ill.1987). We find estoppel to be inapplicable to this case.[3] "The doctrine of equitable estoppel precludes a litigant from asserting a claim or defense which might

---

[3]Our application of estoppel principles to the present facts is limited by the fact that the guarantor in this case is an agency of the United States government. "Traditionally, equitable estoppel did not lie against the government." *Moody v. United States,* 783 F.2d 1244, 1246 (5th Cir.1986). Other circuits have allowed estoppel against the government when the facts satisfied the traditional elements of estoppel *and* exhibited "affirmative misconduct" by a government employee. *United States v. Lair,* 854 F.2d 233, 237–38 (7th Cir.1988); *Portmann v. United States,* 674 F.2d 1155, 1167 (7th Cir.1982); *T.R.W., Inc. v. Federal Trade Com.,* 647 F.2d 942, 951 (9th Cir.1981). This court has yet to decide the issue. *See Moody,* 783 F.2d at 1246 & n. 2 (declining to decide whether affirmative misconduct would permit estoppel because four traditional elements were not met).

   The Supreme Court has also declined to decide whether estoppel may ever be asserted against the government, even when the facts demonstrate "affirmative misconduct" on the government's part. *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981). The Court has made clear that "the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). In *Heckler,* the Court noted that the party asserting estoppel against the government must at least "demonstrat[e] that the traditional elements of an estoppel are present." *Id.* We find that Premier has failed to make this demonstration.

otherwise be available to him against another party who has detrimentally altered her position in reliance on the former's misrepresentation or failure to disclose some material fact." *Portmann,* 674 F.2d at 1158. To begin with, we find it difficult to conceive how EDA's failure to respond as required could amount to a misrepresentation or omission of material fact. Even if we agreed with Premier that EDA's failure precluded EDA from denying its obligation to pay, thus allowing Premier to rely on EDA's payment under the Guarantee Agreement, this would not excuse Premier's subsequent breach of that Agreement. And Premier could not have acted in reliance on the belief that EDA had terminated its obligations under the Agreement, because Premier continued to pay the guarantee fees and sued for specific performance of the Agreement. We find the doctrine of equitable estoppel inapplicable to this breach of contract dispute.

In summary, we find that EDA materially breached the Guarantee Agreement by failing to respond to Premier's demand for payment as that Agreement required, but Premier elected to affirm and continue the contract and thus remained bound to its terms. Premier's subsequent breach is thus not excused by that of EDA.

AFFIRMED.

. . . . .